# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-02043-SCT

*IN RE: ESTATE OF WILLIAM F. MCLEMORE,*
*DECEASED: GERALD D. MCLEMORE*

*v.*

*DENNIS M. MCLEMORE, FLOYD SHANNON*
*MCLEMORE, JACKIE MCLEMORE AND*
*ESTATE OF COLLEEN H. MCLEMORE*


| | |
|---|---|
| DATE OF JUDGMENT: | 10/11/2007 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | AUBREY LEE BROWN, JR. |
| | ROSS EMERSON WEBSTER |
| ATTORNEYS FOR APPELLEES: | STEVEN W. PITTMAN |
| | SUSAN ELIZABETH MACKENZIE |
| | EDWARD THOMAS AUTRY |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED AND REMANDED IN PART - 03/31/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2009-CA-00784-SCT

*IN RE: JACKIE MCLEMORE, DENNIS*
*MARSHALL MCLEMORE, INDIVIDUALLY AND*
*AS CO-EXECUTORS OF THE ESTATE OF*
*COLLEEN H. MCLEMORE AND FLOYD*
*SHANNON MCLEMORE*


*v.*

*GERALD D. MCLEMORE, EXECUTOR OF THE*
*ESTATE OF WILLIAM F. MCLEMORE,*
*DECEASED, GERALD D. MCLEMORE,*
*TRUSTEE OF THE WILLIAM F. MCLEMORE*
*LIVING TRUST, WILLIAM F. MCLEMORE*
*MARITAL TRUST AND WILLIAM F.*
*MCLEMORE FAMILY TRUST, AND FIRST*
*SECURITY BANK, TRUSTEE OF THE WILLIAM*
*F. MCLEMORE MARITAL TRUST*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/09/2009 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | STEVEN W. PITTMAN |
| | SUSAN ELIZABETH MACKENZIE |
| | EDWARD THOMAS AUTRY |
| ATTORNEYS FOR APPELLEES: | AUBREY LEE BROWN |
| | ROSS EMERSON WEBSTER |
| NATURE OF THE CASE: | WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART AND REMANDED IN PART; ON CROSS-APPEAL: AFFIRMED IN PART AND REMANDED IN PART - 03/31/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     This case[1] involves the administration of William F. McLemore's estate and trusts.

William appointed his widow, Colleen McLemore, and son, Gerald McLemore, as

---

[1]The two consolidated cases effectively represent one case with a series of trial-court orders, several of which came after the parties filed their first notices of appeal and cross-appeal. In the second case, First Security Bank, as a successor trustee after Gerald McLemore's removal, is listed as a party. But the record does not reveal that the bank appeared at trial or filed anything with the trial court. The bank did not submit a brief, but did file a motion in this Court, seeking to file a statement clarifying the assets in one of the trusts.

coexecutors of his will and cotrustees of his trusts. Following William's death, very little was accomplished without strife and litigation, dividing the family. According to the chancellor, in the nearly nine years since William's death, this case has been "hotly litigated" with some "highly anxious moments." Thirty-six volumes of record detail the conflicts, which included motions for removal of executors and trustees, motions to compel, motions for contempt, motions for sanctions, a cease-and-desist letter, last-minute filings, contentious practices by attorneys, a retaliatory motion, and claims of fraud.

¶2.    Although the fitness of Gerald and Colleen to have continued as fiduciaries is hotly debated in the briefs, no party raised as an issue the chancellor's denial of all attempts to remove Gerald as executor.[2]  Thus, the issue of retaining the same coexecutors and cotrustees is not before the Court and will not be discussed further.

¶3.    William amassed a great deal of wealth, primarily represented by real-estate holdings in DeSoto County, Mississippi, and Shelby County, Tennessee. By the time he died on May 11, 2002, he had been married to Colleen for more than sixty-seven years. They had four sons, Gerald, Billy, Dennis, and Shannon. William and his sons worked together in various real-estate and farming operations. They were involved in many property transactions, including trading properties with each other. William gave and loaned money to his sons on numerous occasions over the years. A longstanding hostility existed among the sons.

---

[2]After Colleen (and two of her sons, Billy and Dennis) petitioned to remove Gerald, she sent two letters to her attorney, stating that she no longer sought his removal. But the petition was never withdrawn. Subsequently, Billy and Dennis petitioned for the removal of Gerald *and Colleen*. Colleen's removal was mooted upon her death. Gerald was removed as trustee by a majority vote of the other trust beneficiaries.

None of the others liked Gerald. The relationship between Gerald and Billy was especially poor. Both testified that they had not spoken to each other in fifteen years. In William's will and trusts, Gerald and Colleen were appointed coexecutors of the estate and cotrustees of the trusts. After William died, Colleen continued William's practice of providing money to their sons, particularly to Dennis and Shannon.

¶4.  After cooperating initially, Gerald and Colleen disagreed over: (1) ownership of various properties; (2) loans/gifts to Dennis and Shannon; and (3) remuneration for rent-collection, building maintenance, and contracting with new tenants. At the suggestion of Billy and Dennis, Colleen retained an attorney to seek Gerald's removal as coexecutor and cotrustee. After initially attempting to act as a liaison and peacemaker, Shannon joined Billy and Dennis against Gerald. Their efforts to remove Gerald as executor did not succeed. When family tensions worsened, Colleen excluded Gerald as an heir to her estate and as a beneficiary of a trust she controlled. She named Billy and Dennis as her coexecutors. On January 21, 2007, after trial had begun, Colleen died. Her estate was substituted in her stead. Upon Colleen's death, Gerald became the sole executor and trustee of William's estate and trusts. Then his three brothers, a majority of the trust beneficiaries, voted to remove him as trustee. Following trial, Billy died, and Jackie McLemore, as personal representative of his estate, was substituted in his stead.

¶5.  The conflict over the disposition of one parcel, known as the Elvis Ranch and Bank Building ("Elvis property"), was especially contentious. Part of this property was once owned by entertainer Elvis A. Presley. It represented a large share of the family's wealth. Colleen and William had contracted to sell the property in 2002 for $7,000,000, but the sale

4

was never completed. Other sales opportunities occurred later; Gerald had a buyer, and his brothers had another buyer. The chancellor considered and approved various petitions for orders to confirm sales contracts and for authority to sell the property, but no sale had been consummated by the time of the chancellor's post-trial orders in October 2007.

¶6. The record of the second case is primarily comprised of billing records of the attorneys for Gerald and Colleen's estate. After trial, the chancellor awarded fees of approximately $420,000 to Edward T. Autry, the attorney for Colleen's estate, based in part on his affidavit that he and Colleen had operated under an oral agreement for attorney fees ranging from $175 to $350 per hour. Later, a written fee agreement (setting the hourly fee at $175), signed by Colleen and Autry, turned up in discovery in another case involving these parties. At that time, Gerald charged that Autry, as well as Billy and Dennis, had committed fraud upon the court by claiming not only that no written agreement had existed, but that Autry and his firm had never used written fee agreements. Autry retaliated by claiming that Gerald's attorney, Aubrey L. Brown, Jr., had committed fraud by continuing to operate under an old fee agreement and failing to complete a new agreement after Brown had changed firms.

**FACTS AND PROCEDURAL HISTORY**

¶7. William completed his will and trust documents in 1994. The will called for Colleen and Gerald to be appointed as William's personal representatives and for distribution of all of William's property to the William F. McLemore Living Trust. William was to be the sole trustee of the living trust until his death. Colleen and Gerald were to become trustees upon William's death. The living trust provided for the trustees to receive "fair and reasonable

5

compensation for the services [they render as fiduciaries]." The trustees also were to be "reimbursed for the reasonable costs and expenses incurred in connection with [their] fiduciary duties." The trustees were authorized "to employ attorneys . . . and other such agents as [they] shall deem necessary or desirable. . . . [They] shall reasonably compensate those persons or entities . . . ." There was no provision in the living trust for payments of compensation, reimbursement, or professional fees of the other beneficiaries who were not named trustees.

¶8.     The living trust allowed for removal of trustees. After William's death, Colleen was authorized to remove any trustee for cause. After the death of both William and Colleen, a majority of the beneficiaries could remove a trustee without cause.

¶9.     The living trust called for the distribution of all living-trust property into two separate trusts (marital and family) upon William's death. The marital trust was to receive all property, less $1,000,000 ("the smallest amount which, if allowed as a marital deduction, would result in the least possible federal estate tax being payable . . . "). The family trust was to be funded by property valued at $1,000,000.

¶10.     The trustees of the marital trust were to "pay to or apply for the benefit of [Colleen], at least annually during [her] lifetime, all of the net income from the Marital Trust." Regarding Colleen's final expenses, the trustees of the marital trust "may, in [their] sole and absolute discretion, pay for the following expenses: . . . Any inheritance, estate, or other death taxes payable by reason of [Colleen]'s death . . . ." The same section of the living trust cautioned, "Without in any way limiting my Trustee's discretion, it is my desire that my Trustee not make any payments under this Section if those payments can be satisfied from

6

[Colleen's assets] outside of the marital trust." Upon Colleen's death, any remaining balance of the marital trust was to be divided into equal shares, one for each of the four sons.

¶11. The family trust was to be funded by property equaling $1,000,000 in value. The living trust granted Colleen "the limited testamentary power to appoint to or for the benefit of my descendants . . . by a valid last will and testament . . . , all or any portion of the *principal* and any . . . income of the Family Trust . . . . [Colleen] may make distributions among my descendants in equal or unequal amounts . . . ." (Emphasis added.)

¶12. The attorney who drafted the documents testified that William's intent was to transfer all his real property into the living trust, but this was never done. Thus, the living trust was not funded when William died. However, William's will stated, "If my revocable living trust is not in effect at my death for any reason whatsoever, then all of my property shall be disposed of under the terms of my revocable living trust as if it were in full force and effect on the date of my death."

¶13. In his latter years, William continued to transact business and was involved in the lives of his sons. William collected the rent on his properties and made deposits to an account at BancorpSouth. Records were kept at an office located at the family's Greenriver Farms property. A secretary, Gloria McCarson, who worked for William and Dennis, maintained the records. At one time, William and Dennis owned the farm, an approximately 2,400-acre property, in equal shares. According to Dennis's testimony, he bought his father's share in 1998 in exchange for assuming all the farm debt.[3] Dennis testified that

---

[3]The Elvis property was used as collateral for the farm debt. These attachments were discovered after William's death when his heirs attempted to sell the Elvis property.

another parcel, five acres in Horn Lake, initially was involved in the transaction, but that he and his father had decided that Dennis could keep it. William and Colleen also loaned money to Dennis, totaling $640,673 at the time of William's death.

¶14. William and Colleen helped Shannon by purchasing a house for him in their names. Shannon was to make the payments, but his parents assisted when necessary. These payments totaled $69,098 by the time of William's death. William and Billy traded property, including a parcel on Winchester Avenue in Memphis. Billy testified later that he had thought he owned the parcel, but conceded that it was an asset of William's estate.

¶15. After William died on May 11, 2002, one of the first disputes arose over what asset(s) should be used to fund the family trust, as well as the timing of the transfer (whether it should occur before or after William's estate-tax return was accepted by the Internal Revenue Service). Difficulty arose over using the Elvis property, as the assessed value ($1,000,000) was less than the selling price on the sales contract ($7,000,000) that William and Colleen already had negotiated. Gerald testified that the purpose of this transaction was to "beat the system." Dennis testified that the Elvis-property dispute was the reason they had encouraged Colleen to find her own attorney. Although a closing date had been set, the sale never occurred, and the property remained in William's estate.

¶16. After the family cooperated initially regarding day-to-day business management, disputes arose. Gerald was in charge of rent collection and was assisted by Billy and Dennis. Gerald and Colleen decided to continue using the same bank account William had used ("rental account") to deposit rent checks. Records were maintained by McCarson at the farm office. After a few weeks, Gerald, in the summer of 2002, told his brothers that, with all

8

three of them collecting rent, he was unable to maintain control of the operation, and that he would be the sole rent collector. During this time, Colleen drafted checks totaling $30,000 from the rental account to satisfy arrearage in child-support payments owed by Shannon. Gerald insisted that the families of the other three sons be given the same amount, which he effected from estate funds in his control. Also during this time, Colleen began to loan money to Dennis from the rental account. In December 2002, Gerald confronted his mother about these loans, but otherwise did nothing to stop the loans from continuing. The loans totaled $383,500 at the time of Colleen's death.

¶17. Meanwhile, Gerald began questioning the ownership status of various properties (including Greenriver Farms, the Horn Lake property, and the Winchester property), and whether they should be included in William's estate. He also investigated whether Dennis and Shannon owed the estate for the funds they received prior to William's death. Colleen wanted to leave these matters to the past and asked Gerald not to pursue them.

¶18. These disputes came to a head in December 2002 and January 2003. Gerald informed Colleen that he could not continue as the sole rent collector unless he began to receive an annual fiduciary compensation of $20,000. Colleen never agreed to this, and Gerald stopped collecting rent in January 2003. Colleen, who had become concerned that no one was maintaining the properties or working to find tenants for vacant buildings, enlisted the help of Dennis and Billy. After Dennis was added as a signatory to the old rental account in December 2002, Colleen and Dennis closed that account. They transferred its funds into a new rental account on February 19, 2003. Colleen and Dennis were the sole signatories of the new rental account. Dennis and Billy testified that, after Gerald quit, they

9

collected rent, maintained buildings, and negotiated contracts with new tenants. Gerald admitted that, once Dennis and Billy took over, he never inquired as to who was collecting rent. He did, however, have a lawyer send a letter to Dennis and Billy, ordering them to cease and desist from collecting rent or handling any of the affairs of the estate. Gerald admitted that this was the only letter he sent to his brothers during his tenure as executor and trustee. Billy and Dennis testified that, upon Colleen's advice, they ignored this letter because Gerald was not performing the duties. Meanwhile, Dennis continued to receive funds from the new account (an account upon which he had signature authority) as he had from the old account.

¶19. At approximately the same time as the changeover of the account, Colleen retained Autry as her attorney, and Taylor Buntin, who had served Colleen and Gerald as cofiduciaries, withdrew. Billy and Dennis were the first to contact Autry. They met with him on January 9, 2003. Autry wrote an opinion letter for Billy and Dennis, who then shared it with their mother. Autry then prepared, signed, and sent Colleen a written fee agreement for her approval. This first proposed agreement was never returned, and Autry sent another. Colleen signed the second document, but never returned it. On February 12, 2003, nineteen days after Autry sent the second proposed fee agreement, Colleen went to Autry's office and retained him as her attorney. Autry later testified that, prior to the meeting on February 12, he had expended sixty hours under the assumption that his services would be compensated under an hourly-fee basis, payable monthly by the client. He testified that, following this meeting, upon Colleen's decision, they operated under an oral agreement that, at the conclusion of the case, he would petition the court for reasonable attorney fees as allowed

10

in William's living trust. Immediately after Autry was hired, first Colleen and then Gerald petitioned the chancellor to have the other removed as coexecutor and cotrustee. Colleen, Billy, and Dennis charged that Gerald had been derelict in his duties. They also were concerned that properties owned by the estate had not been transferred to fund the trusts. Gerald charged that Colleen was under the undue influence of Billy and Dennis, and, thus, was depleting the estate. He sought judgments in favor of William's estate for Shannon's and Dennis's indebtedness to William at the time of his death, and for the loans to Dennis from the rental accounts.

¶20.   Following the initiation of litigation, Colleen continued to direct the efforts of Billy and Dennis to conduct day-to-day business, while Gerald showed little interest. Dennis continued to receive funds from the new account. Colleen reported the income from the properties owned by William's estate on her individual tax return. Her accountant, Jimmy Luke, testified that she commingled income from properties owned by William's estate with income from properties she owned outright. Luke stated that none of this was relevant to her income tax, as all the income was hers to do with as she pleased, whether it came from property owned outright, or from William's estate's property that should have been transferred to one of the trusts.

¶21.   The preparation and filing of William's estate-tax return likewise was not without issues. The federal return was filed April 14, 2004, without Gerald's signature. Gerald signed the Mississippi return only after the State Tax Commission put a lien on the properties, despite Gerald's belief that the return was incorrect. Gerald claimed, at that time and later at trial, that both returns were incorrect, but he never did anything to correct or

11

amend the filed returns. The federal return included, *inter alia*, as estate property, the Elvis property and the Winchester property, but did not include Greenriver Farms or the Horn Lake property. Included among the debts payable to the estate were: notes receivable from Dennis totaling $640,673 and a note receivable from Shannon for $69,098.

¶22. The disposition of the Elvis property was a point of contention throughout. The appraised value prior to William's death was $1,000,000. William and Colleen had signed a contract with a buyer who had agreed to pay $7,000,000. The closing date was to be June 16, 2002, but the sale never occurred. In 2005, Gerald, in anticipation of selling the property, transferred it from the estate to the marital trust. Later that year, Gerald had a buyer and sales contracts, and Billy and Dennis had a different buyer and sales contracts. Each side petitioned the chancellor for an order to confirm the contracts and for authority to sell the property. The chancellor confirmed the contracts submitted by Billy and Dennis and granted them authority to sell the property. But this sale never occurred. In 2006, the conflict recurred. This time, the court approved the contract submitted by Gerald and authorized the sale, but it never occurred.

¶23. Trial began in November 2006 and continued on six nonconsecutive days through July 2007. On January 21, 2007, Colleen died, precipitating another round of motions and petitions. Gerald, claiming that Dennis had gained de facto control over the rental income, moved to enjoin Dennis from using the funds and to order him to surrender control over that account. On February 20, 2007, the chancellor granted a preliminary and permanent injunction against Dennis. Only after Gerald petitioned for a citation of contempt against Dennis on August 6, 2007, did Dennis comply with the injunction. After Gerald regained

12

control over the rental income, he resumed rent collection, but still had not transferred all the property to the trusts. He testified at trial in April 2007 that he already had made all the transfers to the living trust, but had refused to transfer the deeds to the marital trust, as he believed it had ceased to exist when Colleen died.

¶24. On February 16, 2007, Billy, Dennis, and Shannon, a majority of the beneficiaries of William's living trust, voted to remove Gerald as a trustee. Gerald received notice of this action on March 31, 2007. Following this, a corporate trustee, First Security Bank, was named as Gerald's successor, but had not accepted appointment by the time of the chancellor's post-trial orders.

¶25. Again in 2007, as the hearing date on the Elvis property approached, each side had its own buyer. Shannon moved to compel Gerald to transfer the property from the family trust to its three beneficiaries (Billy, Dennis, and Shannon) so that they could sell the property for $7,500,000. Shannon argued that Gerald was no longer a beneficiary of the family trust, as Colleen had excluded him in her will using the authority granted her in William's living trust. Recognizing that Gerald had filed a challenge to Colleen's will, Shannon agreed that provisions should be made to protect Gerald's interest, pending the outcome of the probate action.

¶26. Among the other motions presented before and during the trial were: (1) Gerald's motion for order requiring Dennis, individually and as coexecutor of Colleen's estate, to account for estate funds and property; and (2) Shannon's motion to clarify judgment and verified complaint for temporary restraining order against Gerald. In Shannon's motion, he argued that Gerald had been voted out as a trustee, remaining only as an interim trustee

13

pending acceptance by a successor, and was no longer a beneficiary of the family trust. Shannon alleged that Gerald recently had attempted to negotiate the sale of the Elvis property, and that, by his other actions and inactions as trustee, he was acting against the interests of the family-trust beneficiaries. Shannon sought an order limiting Gerald's authority as interim trustee to rent collection and deposit, as well as other day-to-day functions. Specifically, Shannon requested that Gerald be prohibited from coming onto or about the Elvis property or engaging in any solicitation or negotiations to sell the property.

¶27. At trial, neither Dennis nor Shannon contested the requirement to repay the loans they had received from William. Neither challenged the net loan amounts as reported in William's estate-tax return. Gerald argued that Dennis and Shannon had received sufficient funds since William's death to have begun repaying their debts, but admitted that he had never asked them to begin repayment. Dennis did not challenge the requirement to repay the amounts Colleen had given him from the rental receipts. Although Dennis failed to provide the records of the new rental account in response to a discovery request, records of the account were available to the chancellor at trial.[4] Dennis testified and was cross-examined about his use of the funds.

¶28. The chancellor issued a series of post-trial orders on August 17, 2007. The chancellor found that, as a majority of the trust beneficiaries had removed Gerald as trustee, the issue of his removal was moot. However, since the successor trustee had not accepted appointment, Gerald was to continue as trustee. Further, the chancellor granted Shannon's

[4]These included monthly account statements for February 2003 through July 2003 and charts listing all deposits, transfers, withdrawals from January 2003 through May 2006.

14

motion to limit Gerald's duties as trustee and to restrain him from coming onto or around the Elvis property, or attempting to solicit or negotiate its sale. The chancellor found that Colleen and Dennis had made unauthorized loans of estate funds to Dennis and/or Greenriver Farms in the amount of $383,500. Thus, he ordered a judgment in favor William's estate of $192,800 (the unpaid balance) against Colleen's estate and Dennis, jointly and severally. The chancellor found that, at the time of William's death, Dennis owed William $640,673, and Shannon owed $69,098. Thus, the chancellor ordered judgments in favor of William's estate against Dennis and Shannon for those amounts. The chancellor denied Gerald's request for prejudgment interest on these awards. Regarding his decision not to order prejudgment interest on Colleen's loans to Dennis, the chancellor found Colleen's actions to have been in error, although he did not impute any bad intent to her, as she had "thought she was doing right . . ." and had tried unsuccessfully "to satisfy and/or make peace between the family."

¶29. The parties then filed, *inter alia*, the following: (1) all parties' petitions for attorney fees with attached time records and attorney affidavits; (2) Colleen's estate's and Gerald's petitions for fiduciary commissions for service as coexecutors and cotrustees; (3) Gerald's petition to construe and enforce the living trust such that Colleen's estate tax be paid from her assets, other than marital-trust assets; (4) Colleen's estate's petition for order directing payment of Colleen's estate tax from the marital trust; (5) Gerald's motion to alter or amend the judgments to add awards of prejudgment interest; (6) Shannon's petition to compel Gerald, as trustee of the family trust, to transfer the Elvis property to Billy, Dennis, and Shannon; (7) Billy, Dennis, and Shannon's petition for order transferring judgments from

15

William's estate to the marital trust.

¶30.    Autry, as attorney for Colleen's estate, stated in his attorney-fee affidavit that he met with Billy and Dennis on January 9, 2003, to discuss the case and render legal advice.  The affidavit continues:

> On February 12, 2003, pursuant to an oral agreement, I undertook to represent Colleen . . . in her capacity as Co-Executor of [William's estate] and Co-Trustee of the [living trust, marital trust, and family trust], for services rendered at hourly rates ranging from $175 - $350 per hour for attorneys . . . and at said time[,] Colleen . . . ratified all of my actions and time incurred prior to my engagement[,] researching issues to or for her benefit as same relates to her fiduciary responsibilities . . . .

Neither a written fee agreement nor any written fee proposal was mentioned.  Autry requested a total of $404,281.50 for services rendered through August 30, 2007, the date of the affidavit.  He also requested an award of $50,000 as an estimate of future services to be rendered up to the closing of William's estate.  On September 20, 2007, when these requests were argued, Autry requested an additional amount representing fees incurred to that date and renewed his request for future fees.  Autry also argued in favor of a fee award to Steven W. Pittman, the attorney for Billy and Dennis.  When Gerald's attorney, Aubrey L. Brown, Jr., questioned why Autry was doing this, Autry replied:

> I will make it clear . . . I represent Colleen McLemore, and since she's died, I represent her Estate.  My agreement with Colleen was that she hired me. . . . She asked me to . . . move this estate along, and that's what I did.  The facts are, Your Honor, we don't get retainers and we don't really engage in written, I guess, employment agreements because we just never have, Your Honor. . . . The practice in our office is not to ask for fees until the Estate is finished.

Brown did not question the number of hours Autry claimed, but stated that he was troubled by the lack of a written agreement and charged that Autry actually was representing the other

16

sons. He asked, "Is it your representation there is no other written agreement with any other beneficiary, Dennis or Billy or Shannon?" Autry replied:

> Again, it's my practice that we just – wrong or right, we don't generally have written retainer agreements because clients come to us and they ask us. They're not there because we ask them to be there and because we solicit them; they're there because they want to be and they need help. That's generally how we practice, and I've practiced that way since I first became licensed, Your Honor.

¶31. On October 11, 2007, the chancellor issued another set of post-trial orders. All the attorney-fee requests were approved. Brown was awarded approximately $177,000 as an interim payment for services rendered through June 30, 2007. Shannon's attorney, Susan MacKenzie, was awarded approximately $41,000 as interim payment for her services and expenses. Pittman was awarded approximately $44,000 as interim payment for his services and expenses. Autry was awarded fees of $420,891.50 for his services provided through September 20, 2007, and expenses in the amount of $7,000.96 for the same period.

¶32. The chancellor found that Colleen had provided valuable and necessary services to William's estate during her tenure as coexecutor and cotrustee, and found that Autry had represented Colleen's interests, as well as those of her estate, as they related to William's estate. The chancellor based the award on the time records and affidavit presented by Autry. However, the chancellor declined to award fees based on Autry's estimate of future services to be rendered after September 20, 2007, as Colleen's service to William's estate had ended upon her death.

¶33. The chancellor approved fiduciary commissions for Colleen's estate and Gerald for their services as coexecutors and cotrustees. Gerald requested a commission based on a

17

formula for a corporate trustee ($400,000, split equally between Colleen's estate and Gerald). Colleen's estate asked for approximately $120,000, based on a percentage of the gross estate. Each was awarded $160,000. The chancellor found that each had administered William's estate and had provided valuable and necessary services to the estate and trusts.

¶34. After hearing argument, the chancellor denied Colleen's estate's motion to direct payment of Colleen's estate taxes from the marital trust. Gerald argued that William's intent, expressed in the living trust, was that the marital trust not be used to pay Colleen's estate taxes if other funds sufficed. He argued further that federal tax law to the contrary is inapplicable where state law and the settlor's intent call for an apportionment different from the method prescribed under federal law. Colleen's estate argued that the Internal Revenue Code, as federal law, trumps state law. He argued that William's intent was irrelevant, as the relevant intent was that of Colleen. She had not waived her right under federal law, thus her estate retained the option to seek contribution from the marital trust.

¶35. The chancellor denied Gerald's motion for prejudgment interest on the loan-repayment judgments and granted the motion to transfer the judgments from William's estate to the marital trust. The chancellor denied Gerald's motion to require Dennis to account for estate funds and property. He did this in the interest of finality, after hearing argument regarding the amount of documentary evidence and testimony on this issue. The chancellor granted the motion to compel Gerald to transfer the Elvis property from the family trust to its beneficiaries, Billy, Dennis, and Shannon. In the judgment, the chancellor included six provisions to protect Gerald's claim of interest in the property, pending judgment in the probate of Colleen's will. Each provision called for a notation to be placed on the deed of

18

conveyance detailing its effect upon the transfer. The chancellor ordered, *inter alia*, that, if a sale of the property occurred, one-fourth of the proceeds of the sale, plus $250,000, be placed in escrow to provide for Gerald's share if he were to succeed in challenging Colleen's will.

¶36. Gerald filed his notice of appeal in November 2007, followed by a cross-appeal by Billy and Dennis. In December 2007, Billy, Dennis, and Shannon filed contempt motions against Gerald because he had not complied with the chancellor's orders, including those to transfer the Elvis property out of the family trust and to transfer the judgments from the estate to the marital trust. Gerald responded to these motions and requested Rule 11 sanctions against Billy, Dennis, Shannon, and their attorneys. *See* Miss. R. Civ. P. 11. In February 2008, the chancellor granted the contempt motions, but found that Gerald's actions had not been willful and that he had purged himself of contempt. Gerald's requests for sanctions were denied.

¶37. On April 8, 2008, Gerald moved under Rule 60 to vacate the final judgment awarding fees to Autry and for disgorgement of all amounts paid, as well as for contempt and Rule 11 sanctions. *See* Miss. R. Civ. P. 11, 60. Gerald alleged that newly discovered evidence supported his motion. In response to a discovery request in the litigation over Colleen's will, Billy had provided a copy of an attorney-fee agreement signed by Autry and Colleen. The document set hourly fees at: Attorney, $175; Associate Attorney, $125; Paralegal, $100. Two days later, Autry filed a similar motion against Brown. Autry's motion called for disgorgement of all fees paid to Brown and for sanctions and a citation of contempt because Brown had committed fraud upon the court by continuing, after he moved to a new firm, to

19

use a fee agreement drawn up while he was at a prior firm. On the same day, Autry also moved to vacate the order approving executor fees to Gerald, and for sanctions and for a finding of contempt against Gerald, because he had known that the only fee agreement between him and his attorney was one from a prior law firm. Brown then moved for additional sanctions against Autry, Billy, and Dennis, because they had retaliated by filing a nearly identical motion that had no basis in fact or law, that was patently frivolous, and was brought solely for the purpose of harassment.

¶38. In Autry's responses to Brown's motions, he asserted that: (1) the chancellor did not base the fee award on his representations concerning a written agreement; (2) he did not recall who requested the purported written agreement; (3) he signed and forwarded the proposed fee agreement to Colleen; (4) Colleen never returned the document; (5) he and two of his employees had searched the client file and had not found a copy of the agreement; (6) the document is not a binding contract, as it was not returned; (7) he never sent a bill to Colleen based on the document; (8) Billy, Dennis, and Shannon had searched Colleen's papers and had not found a copy of the document; (9) the document was not newly discovered evidence, as due diligence and proper inquiry by Brown would have produced it. Autry's response included a copy of a letter he had sent to Brown. In it, he asserted that his motion had not been in retaliation. The letter continued, "I simply grew tired of your repeated misrepresentations to the Court and counsel that there is a written fee agreement by and between [Gerald] and yourself and your firm." The letter closed with an offer to withdraw the motion if Brown would reciprocate.

¶39. Billy testified that he recalled when Colleen received the proposed fee agreement, and

that he, as was his custom with all documents Colleen received, had made a copy of it and had returned the original to Colleen. Billy continued his testimony by proffer, stating that Colleen had found it difficult to sign the document, as it meant firing her old attorney and beginning litigation against her son. Billy testified that Colleen signed the document, but he could not recall whether she returned it to Autry. Autry argued that he had logged sixty hours of work under the fee agreement before Colleen decided that she would rather petition the court for reasonable fees at the conclusion, rather than pay a monthly, per-hour fee. At oral argument, Autry repeated the claim made prior to the fee award, "Quite frankly, your Honor, I don't know who asked me to prepare a written fee agreement because, again, and I'll say it again for the Court, and make sure it's clear on record, my firm doesn't enter into written retainer agreements." In a supplementary response to the court, Autry listed 146 estate cases over the previous eighteen years in which he had been the attorney of record. In three of these cases, Autry and his client operated under a retainer agreement.

¶40. Autry's attorney argued that the clear-and-convincing standard for fraud had not been met. He argued that it was not necessary for Autry to have disclosed the purported fee agreement; as Autry did not know that a signed agreement existed, it was not something that the court should have taken into account. In his bench ruling, the chancellor found that Autry's actions did not constitute fraud, but that the court should have been advised of the proposed fee agreement, as it was something the court would have considered. The chancellor ordered Autry's fee award to be based on the proposed agreement ($276,033.75) and that the difference in that amount and the previous award ($420,891.50) was to be disgorged.

21

¶41. The chancellor dismissed Autry's motion, as he found no misrepresentation by Brown. He found that Autry's motion mirrored Brown's and that it had been filed for retaliatory reasons. The chancellor denied fees to either side for bringing these motions.[5] However, the chancellor exercised his discretion and denied the motions for sanctions against Autry even though he found it a "close question."[6]

¶42. After the successor trustee, First Security Bank, accepted the court's appointment replacing Gerald in December 2007, the process of closing William's estate, as well as funding and winding up the trusts, accelerated. This occurred despite the ongoing battle over attorney fees and the successful contempt motions against Gerald as detailed above, as well as another unsuccessful effort to remove Gerald as executor. As the closure of William's estate approached, all the attorneys except Autry submitted supplemental fee requests, all of which were approved.[7]

---

[5]This order is irrelevant to Autry, as the chancellor already had cut off fees following Colleen's death. However, as will be seen below, this order is inconsistent with the fee awards subsequently made to Brown.

[6]Brown requested $10,643 as the sanction amount, representing that one-half of the fees logged in April 2008 was an approximation of the amount expended in defending against Autry's retaliatory motion. In answer to the chancellor's question, Brown replied that, if these fees were not paid by Autry as a sanction, they would be part of his attorney-fee request for payment from William's estate.

[7]Autry did not make a request, as the chancellor had ruled that fees were no longer payable for services after Colleen died and ceased being a fiduciary. Brown requested and received $156,462.95 for his total fees and expenses for the period from July 1, 2007, through February 20, 2009. Without breaking down the amounts, Brown claimed that these fees included those for prosecuting the successful disgorgement motion against Autry. MacKenzie submitted multiple interim requests and received $34,308.95 as the net amount due. Pittman was the only attorney to break the request down between trial-court fees and appeal fees. He requested $11,355, specifying that $174 of that total was in preparation for appeal. He received the full amount requested, $11,355.

¶43. On April 13, 2009, the chancellor ordered the estate closed and Gerald discharged of his duties as executor. Billy, Dennis, and Shannon appealed, and Gerald cross-appealed.

## ISSUES

¶44. The parties raised these issues, which have been edited, combined, and reordered for clarity and brevity.[8]

I. Whether the chancellor erred in awarding attorney fees and expenses to Autry, Pittman, and MacKenzie.

II. Whether the chancellor erred in granting Brown's Rule 60 motion, reducing the fee award to Autry and ordering disgorgement of fees.

III. Whether the chancellor erred in denying Brown's motion for Rule 11 sanctions against Autry.

IV. Whether the chancellor erred in awarding fiduciary compensation to Colleen's estate for her services as coexecutor of William's estate.

V. Whether the chancellor erred in ordering Gerald, as trustee of the family trust, to transfer the Elvis property out of the trust.

VI. Whether the chancellor erred in denying prejudgment interest upon the judgments awarded to William's estate.

VII. Whether the chancellor erred in denying Gerald's motion for order requiring Dennis, individually and as coexecutor of Colleen's estate, to account for estate funds and property.

---

[8]The following issues arose from Gerald's 2007 appeal: grant of attorney fees to Autry, Pittman, and MacKenzie; award of executor fees to Colleen's estate; denial of petition to require Dennis to account; order to transfer the Elvis property; denial of award of prejudgment interest. These issues arose from Colleen's estate's cross-appeal: discontinuance of attorney fees to Autry; order to pay estate taxes from assets other than the marital trust; lack of award of postjudgment interest.

These issues arose from the 2009 appeal filed by Colleen's estate, Billy, Dennis, and Shannon: reduction in fee award and order to disgorge; award of fees to Brown since 2007; attorney fees for this appeal. These issues arose from Gerald's cross-appeal: award of additional attorney fees; denial of Rule 11 motion; attorney fees for this appeal.

VIII. Whether the chancellor erred in denying Colleen's estate's motion to allow payment of estate taxes from marital trust funds rather than from her estate's funds.

IX. Whether the chancellor erred in granting fees to Brown for services provided after July 3, 2007, and in denying an award of fees to Autry for services provided after September 20, 2007.

X. Whether the chancellor erred in failing to order postjudgment interest on the awards of attorney fees and executor commissions.

XI. Whether this Court should award the parties their attorney fees and expenses incurred in bringing and defending this appeal.

## ANALYSIS

¶45. In *Lowrey v. Lowrey*, 25 So. 3d 274 (Miss. 2009), this Court stated the following:

> "'A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous.'" "However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." A chancellor's conclusions of law are reviewed de novo.

*Id.* at 285 (citations omitted).

**I.      Whether the chancellor erred in awarding attorney fees and expenses to Autry, Pittman, and MacKenzie.**

*Autry*

¶46. "Regarding attorney's fees, '[i]t is well-settled that the amount allowable as attorney's fees for services rendered in the administration of an estate rests within the sound discretion of the chancery court.'" *Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert,* 991 So. 2d 1209, 1211 (Miss. 2008) (quoting *Harper v. Harper*, 491 So. 2d 189, 200 (Miss.1986)). "[A] trial court's decision regarding attorneys' fees will not be disturbed by an appellate court unless it is manifestly wrong." *Tupelo Redevelopment Agency v. Gray*

24

*Corp., Inc.*, 972 So. 2d 495, 521 (Miss. 2007). Statutes allow for the payment of attorney fees of executors from estate funds. *See* Miss. Code Ann. § 91-7-281 (Rev. 2004). Mississippi Code Section 91-7-299 (Rev. 2004) provides that "the court may allow [an executor's] necessary expenses, including a reasonable attorney's fee, to be assessed out of the estate, in an amount to be determined by the court." *Id.* As was done here, "a testator could expressly provide in his will that his executor should have the power to employ counsel to assist him in the administration of the trust estate; and that a reasonable fee for such services should be a charge against the trust estate." *Gwin v. Fountain*, 159 Miss. 619, 126 So. 18, 22 (1930). William's will and trusts made Colleen a coexecutor and cotrustee. The living trust authorized her to hire and compensate an attorney. A chancellor is required to review the reasonableness of requests to charge fees to an estate, considering the *McKee* factors. *See McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). *See* Miss. R. Prof'l Conduct 3.3(a). This Court has adopted the lodestar method, in which "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate." *Tupelo Redevelopment Agency*, 972 So. 2d at 522 (quoting *BellSouth Personal Commc'ns, LLC v. Bd. of Supervisors of Hinds County*, 912 So. 2d 436, 446-47 (Miss. 2005)).

¶47. Gerald does not challenge the chancellor's authority to grant fees, but argues that fees are not warranted here, as Autry's services did not inure to the benefit of William's estate. The chancellor found that Colleen had provided valuable and necessary services to William's estate and that Autry had represented her interests, as well as those of her estate, as they related to William's estate. Among the services provided by Colleen, as assisted by

25

Autry, were the following: (1) directing her sons' rent collection, lease negotiation, and property sales; (2) securing the release of claims on the Elvis property; (3) completing estate-tax and income-tax returns; and (5) recovering $70,000 that Gerald had claimed as his personal property.

¶48. Gerald asserts that Colleen's payments to Dennis and Shannon reveal that her neglect and maladministration had led to financial losses for the estate. He cites cases in which this Court has found manifest error in a chancellor's fee award. *See* ***Will of McCaffrey v. Fortenberry***, 592 So. 2d 52, 63 (Miss. 1991) (attorney withdrew $93,000 in fees in a haphazard manner for more than seven years; financial loss to estate was incalculable as an inventory had not been done in ten years); ***Matter of Chambers***, 458 So. 2d 691, 693 (Miss. 1984) (annual accounting not done, failure to file tax returns resulted in penalties and interest). Here, Colleen loaned money to Dennis, gave money to her grandchildren, and failed to require Dennis and Shannon to repay their loans. The chancellor found that Colleen was in error, but did not impute any fault to her, as he found that she had thought she was doing the right thing, while maintaining day-to-day operations and trying unsuccessfully to keep the family together. These payments did not result in a loss to the estate, as judgments were entered requiring their repayment.

¶49. Finally, Gerald argues that fees should be denied to Autry because of his lack of candor to the court in failing to acknowledge the proposed fee agreement. Gerald claims that Autry misled the court, violating his duty of fidelity to the court. *See* ***Barrett v. Miss. Bar***, 648 So. 2d 1154, 1158-59 (Miss. 1995); Miss. Code Ann. § 73-3-35 (Rev. 2008) (attorney oath); Miss. R. Prof'l Conduct 3.3(a). Gerald now argues that Autry's conduct constituted

constructive fraud, obviating the requirement to prove his intentional deception. *See Tyson v. Moore*, 613 So. 2d 817, 823 (Miss. 1992); *Victory Lane Prods., LLC v. Paul, Hastings, Janofsky & Walker, LLC*, 409 F. Supp. 2d 773, 781 (S.D. Miss. 2006). However, Gerald did not challenge in the trial court the requirement to prove fraudulent intent by a clear and convincing standard. Gerald cites no cases in which an attorney's lack of candor has led to a denial of all fees. By failing to cite authority, Gerald's claim must fail.

¶50. We find that the chancellor did not abuse his discretion in awarding the reduced fees to Autry. The award amount is a separate issue addressed below.

### *Pittman and MacKenzie*

¶51. Gerald argues that the chancellor abused his discretion in awarding fees to the attorneys for the beneficiaries of the estate, as no statutory authority exists to award fees unless the will or trusts otherwise authorize payment. Here, the will and trusts authorize such payments only to Colleen and Gerald. Gerald cites *In re Estate of Gillies*, 830 So. 2d 640 (Miss. 2002), for the proposition that only a personal representative of an estate or trust is entitled or has standing to seek attorney fees, absent authority to the contrary in the will or trust. However, *Gillies* is not as broadly applied as Gerald asserts. *Gillies* involved a dispute between a former administrator of an estate and an attorney she had hired to file a malpractice action against the estate's former attorney. *Id.* at 642. The attorney who filed the malpractice motion was awarded fees for his services, but also sought administration expenses, claiming that he had paid an unspecified estate expense. The chancellor found that the attorney was not entitled to administration expenses. *Id.* at 647. This Court agreed "that the chancellor did not abuse his discretion in determining [that the attorney] was not entitled

27

to administrative expenses." *Id.*

¶52.    Billy, Dennis, and Shannon concede that no statutory or testamentary authority exists to support their fee requests, but contend that caselaw and the facts of this case provide the authority to support a finding that the chancellor did not abuse his discretion. Mississippi generally follows the American rule. "'[I]f attorney's fees are not authorized by the contract or by statute, they are not to be awarded when an award of punitive damages is not proper.'" *In re Guardianship of Duckett*, 991 So. 2d 1165, 1179 (Miss. 2008) (quoting *Hamilton v. Hopkins*, 834 So. 2d 695, 700 (Miss. 2003).

¶53.    This Court has not addressed the precise question before us, although our Court of Appeals recently awarded fees to beneficiaries who were not authorized in the will to receive fees. *In re Estate of Thomas,* 28 So. 3d 627 (Miss. Ct. App. 2009), *cert. denied* 27 So. 3d 404 (Miss. 2010). The court stated, "As for the [beneficiaries]' attorney's fees, the chancellor found that their attorney essentially had to act as attorney for the Estate and that equity required that [they] be reimbursed . . . ." *Id.* at 637. The executor and his attorney had discouraged the beneficiaries "from asking questions concerning the Estate, and it was their lack of cooperation that forced [them] to hire an attorney to ensure a proper handling of their mother's estate." *Id.* The beneficiaries "had no option but to hire an attorney in order to get [the executor] to disclose the details of their mother's estate." *Id.* The court concluded the following:

> we find no error with the chancellor's decision to award them attorney's fees. The supreme court has held that "even where there is no specific statutory authority for imposing sanctions, courts have an inherent power to protect the integrity of their processes, and may impose sanctions in order to do so." *Selleck v. S.F. Cockrell Trucking, Inc.*, 517 So. 2d 558, 560 (Miss. 1987)

(citing *Ladner v. Ladner*, 436 So. 2d 1366, 1370 (Miss. 1983)). The supreme court went on to state that "where a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney's fees and expenses should be awarded to the wronged party." *Id.*

*Thomas,* 28 So. 3d at 637.

¶54. Other states have allowed attorney-fee awards to nonfiduciary beneficiaries where their efforts benefitted the estate and became necessary because of "laches, negligence, or fraud of the legal representative of the estate." *Becht v. Miller*, 273 N.W. 294, 298 (Mich. 1937). Citing similar cases from Connecticut, New York, and New Hampshire, the *Becht* Court stated:

> the case at bar presents the question of the allowance from an estate as administrative expenses of fees and expenses incurred not by the executor or administrator but by a residuary legatee. The question in its precise form has never been heretofore presented for consideration in this jurisdiction. Examination of the decisions of other states reveals the existence of conflicting opinion, but as a general proposition it may be stated that, before such an item may be charged against the estate, it must be shown that the services rendered were beneficial to the estate as a whole rather than to an individual or group of individuals interested therein.
>
> . . . .
>
> A doctrine which permits a decedent's estate to be so charged, should, however, in our opinion, be applied with caution and its operation limited to those cases in which the services performed have not only been distinctly beneficial to the estate, but became necessary either by reason of laches, negligence, or fraud of the legal representative of the estate.

*Id.* at 297-98.

¶55. Other states have followed *Becht*, allowing fee payments. *See In re Keller*, 584 N.E.2d 1312, 1318 (Ohio Ct. App.1989); *Wagner v. Brownlee*, 713 N.W.2d 592, 596-97 (S.D. 2006); *In re Sheldon's Estate*, 24 N.W.2d 875, 876 (Wis. 1946). South Dakota

29

followed ***Becht*** until it passed its version of the Uniform Probate Code, authorizing such payments. *See **Wagner***, 713 N.W.2d at 597; SDCL § 29-A-3-720 ("The court may also award necessary expenses and disbursements, including reasonable attorney's fees, to any person who prosecuted or defended an action that resulted in a substantial benefit to the estate.").

¶56.    Other states have applied the principles enunciated in ***Becht***, but found that fees were not authorized, as the services had not benefitted the estate. *See **In re Phelps' Estate***, 283 P.2d 293, 295 (Cal. Ct. App. 1955); ***Distributors Supply Co. v. Shablow's Estate***, 92 N.W.2d 83, 88-89 (Minn. 1958). Missouri likewise has embraced this concept. "Missouri seems to follow the rule that expenses incurred by a beneficiary of an estate, rather than the personal representative, must be shown to be beneficial to the estate as a whole rather than to just individuals interested therein." ***In re Estate of Murray***, 682 S.W.2d 857, 858 (Mo. Ct. App. 1984). *But see **Foster's Estate v. Theis***, 290 S.W.2d 185, 188-89 (Mo. Ct. App. 1956) (citing ***Becht*** but rejecting its reasoning).

¶57.    Nebraska has allowed such expenses. *See **Matter of Williams' Estate***, 242 N.W.2d 612 (Neb. 1976). The court stated:

> Assuredly there are instances, usually where additional property is brought into the estate, where attorneys' fees of a party other than the executor or administrator may properly be taxed as an expense of administration. Beyond that instance, if a party supplies services which ought to have been supplied by the executor or administrator, then, to that extent, costs or expenses incurred by the party may properly be taxed to the estate.

*Id.* at 615-16.

¶58.    Here, Colleen testified that Gerald would not talk to her and was running roughshod

over the rest of the family. She testified that he hung up on her when she tried to call him and had told her that he hated her. All three brothers testified that Gerald would not communicate with them. Colleen and all three brothers believed that they required attorney services in order to ensure the proper administration of the estate. Autry, as well as Pittman and MacKenzie, were essentially serving William's estate.

¶59. Gerald argues that the services of Pittman and MacKenzie did not inure to the benefit of William's estate. Gerald's brothers claim that they and their attorneys did the following to benefit the estate, carry out William's intent, or lead to the eventual closure of the estate: (1) made efforts that led to the sale of the Elvis property for $7,500,000; (2) prevented Gerald from using family-trust funds to pay administrative expenses of the marital trust; (3) forced the return of family-trust funds withheld by Gerald; (4) enjoined Gerald's actions as interim trustee; (5) released approximately $230,000 to the family trust that had been withheld by Gerald; (6) filed successful contempt motions forcing Gerald to transfer judgments and transfer properties to the appropriate trusts; (7) successfully petitioned the court to require the estate to be wound up and closed.

¶60. These beneficiaries took actions that were required under the circumstances to benefit the estate and move the estate and trusts toward closure. The beneficiaries' attorneys essentially were acting as attorneys for the estate, and Gerald was held in contempt for failing to carry out his duties. We find the logic of *Becht* compelling and, therefore, adopt the principles set forth therein. *See Becht*, 273 N.W. at 297-98. Our chancellors should likewise consider the cautionary language and limitations set forth in that opinion. *See id.* at 298. We find that the chancellor did not abuse his discretion in allowing attorney fees to

31

Pittman and MacKenzie.

**II.      Whether the chancellor erred in granting Brown's Rule 60 motion, reducing the fee award to Autry and ordering disgorgement of fees.**

¶61.    Brown's motion to vacate the chancellor's award of attorney fees to Autry asserts two reasons under Rule 60. *See* Miss. R. Civ. P. 60(b)(1),(3).  The rule provides the following:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
>
>> (1) fraud, misrepresentation, or other misconduct of an adverse party; . . . [or] (3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).

*Id.*  To prevail on this issue, it must be shown that the chancellor abused his discretion as to both of these elements.

*Fraud, misrepresentation, or other misconduct*

¶62.    Colleen's estate asserts that the chancellor's order "was an abuse of discretion because the court found no evidence there was a written fee agreement . . . , nor any evidence of fraud or misrepresentation." This misstates the chancellor's findings.  The chancellor did state that Autry's failure to disclose the written agreement did not rise to the level of fraud, but the chancellor never stated that he had found no evidence of fraud or misrepresentation. The parties debate whether Autry's misconduct met all nine elements of fraud, including the speaker's knowledge of the falsity of his statement. *See **Stringfellow v. Stringfellow***, 451 So. 2d 219, 221 (Miss. 1984); ***Johnson v. Brewer***, 427 So. 2d 118, 120-21 (Miss. 1983). However, a finding of fraud is not essential to granting a motion under Rule 60(b)(1), if

32

misrepresentation or other misconduct is shown. The chancellor made no specific finding regarding misrepresentation, but stated that Autry had failed to disclose the agreement, and that such a contract was something he would have wanted to see. In the order, the chancellor found that (1) the agreement had not been disclosed; (2) Autry "should have advised the court" and; (3) if the agreement had been disclosed, he would have taken it into consideration. The chancellor did not find there was no evidence of an agreement. In fact, he used the agreement as the basis for reducing the fee award.

*Newly discovered evidence*

¶63. Gerald asserts that the written fee agreement constitutes newly discovered evidence, allowing for a reversal of the fee award. This Court has set the requirements for newly discovered evidence, holding that it

> must be evidence in existence of which a party was excusably ignorant, discovered after trial. In addition facts implying reasonable diligence must be provided by the movant. The evidence must be material, and not cumulative or impeaching, and it must be such as to require a different result.

*January v. Barnes*, 621 So. 2d 915, 920 (Miss. 1992). Here, Gerald showed that the evidence had surfaced after the trial. Colleen's estate argues that this evidence could have been discovered by Gerald if he had been diligent in his discovery motions, deposition questions, and cross-examination. Colleen's estate suggests that Gerald should have asked Colleen about the fee agreement, even though she died before Autry's fees became an issue. Autry now argues that Gerald failed to ask him about the fee agreement when the request was heard. Gerald did ask about this subject, and Autry denied that there was a written agreement with Colleen or anyone else. In fact, he volunteered repeatedly that he and his

33

firm did not use these agreements and had never done so. However, in response to Gerald's motion, he stated that he had used them infrequently. Colleen's estate asserts correctly that the chancellor never made a finding that the fee agreement was newly discovered evidence, but the chancellor treated it as such. He stated that Autry should have disclosed the agreement and that he would have considered it if available. Finally, he used the agreement in reaching a different result.

¶64.    We find that the chancellor did not abuse his discretion in granting Gerald's Rule 60 motion, reducing the fee award, and requiring disgorgement of fees.

**III.    Whether the chancellor erred in denying Brown's motion for Rule 11 sanctions against Autry.**

¶65.    "In the absence of a 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors,' the judgment of the court's imposition of sanctions will be affirmed." *Wyssbrod v. Wittjen*, 798 So. 2d 352, 357 (Miss. 2001) (quoting *Kinard v. Morgan*, 679 So. 2d 623, 625 (Miss. 1996)). Gerald asserts that the proper standard of review is *de novo*. *See In re Estate of Ladner*, 909 So. 2d 1051, 1055 (Miss. 2004) (citing *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 945-46 (Miss. 2001)). *See also Stringer v. Lucas*, 608 So. 2d 1351, 1359 (Miss. 1992). In *Amiker* and *Stringer*, this Court recited the familiar abuse-of-discretion standard for sanctions review, but first asked whether the trial court had applied the right legal standard. *See Amiker*, 796 So. 2d at 945-46; *Stringer*, 608 So. 2d at 1359. No legal error occurred or was even alleged here. Thus, Gerald's assertion is without merit.

¶66.    Rule 11 requires all attorneys representing parties to sign all pleadings and motions.

34

Miss. R. Civ. P. 11(a).  The signature "constitutes a certificate that the attorney has read the pleading or motion; that to the best of the attorney's knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay." *Id.*  If a motion, "in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party . . . the reasonable expenses incurred . . . , including reasonable attorneys' fees."  Miss. R. Civ. P. 11(b).

¶67.  "[A] pleading or motion is frivolous within the meaning of Rule 11 only when, objectively speaking, the pleader or movant has no hope of success."  *Tricon Metals & Servs., Inc. v. Topp*, 537 So. 2d 1331, 1335 (Miss. 1989).  In denying sanctions, the chancellor stated the following, "I think [there] was something that Mr. Autry could hang his hat on with reference to [this] motion . . . . [I]t dealt with some issues about written contracts and amount of attorney fees . . . ."  "Though a case may be weak or 'light-headed,' that is not sufficient to label it frivolous."  *Leaf River Forest Products, Inc. v. Deakle*, 661 So. 2d 188, 195 (Miss. 1995).

¶68.  This Court has held that pleadings found to be justiciable, viable, or colorable are not for the purpose of harassment or delay; thus, sanctions are inappropriate.  *See In re Spencer*, 985 So. 2d 330, 339 (Miss. 2008);  *Bean v. Broussard*, 587 So. 2d 908, 913 (Miss. 1991);  *Dethlefs v. Beau Maison Dev. Corp.*, 511 So. 2d 112, 118 (Miss. 1987).  Here, the motion's justiciability is not at issue.  The chancellor's "hang-his-hat-on" statement is tantamount to a finding of colorability.

¶69.  Gerald posits the following as proof that the chancellor erred in denying sanctions:

35

(1) Billy knew that Autry's fee request was a misrepresentation, as he knew his mother had signed a written fee agreement; and (2) Autry's motion was found to be without basis for relief and to have been filed in retaliation to Gerald's motion, which was granted.

¶70. We agree with the trial court that this represents a "very close" question. However, considering the abuse-of-discretion standard, this Court affirms the denial of sanctions. Further, this Court has held that a chancellor's "discretion generally ought be exercised in the context of the facts of the particular case, the language of Rule 11 and its dominant purpose of general deterrence." *Tricon Metals & Servs., Inc. v. Topp*, 537 So. 2d 1331, 1336-37 (Miss. 1989). The chancellor stated, "[T]his matter has been hotly litigated, and highly anxious moments. Matters filed on both sides." All parties filed multiple motions for sanctions, all of which were denied. It is unlikely that the threat of sanctions would have deterred parties with such a penchant for litigation. Under these circumstances, the chancellor did not abuse his discretion, and his judgment should be affirmed.

### IV. Whether the chancellor erred in awarding fiduciary compensation to Colleen's estate for her services as coexecutor of William's estate.

¶71. Gerald requested fees for executor services in the amount of $400,000, to be split equally between Colleen's estate and himself. The chancellor found that Colleen's and Gerald's services had benefitted William's estate, and awarded fees to each coexecutor in the amount of $160,000. Gerald now argues to this Court that Colleen's estate should get no executor fees, claiming that her maladministration caused waste to the estate. In the alternative, he argues that this Court should reduce the award, as it exceeds the amount requested by Colleen's estate. We find that Gerald is judicially estopped from alleging error

36

on this issue, as he is taking a position at odds with the one he took at trial. *See **Pursue Energy Corp. v. Miss. State Tax Comm'n**,* 968 So. 2d 368, 377 (Miss. 2007). Further, Gerald did not challenge the award of executor fees to Colleen's estate in the trial court. This Court will not hold "a trial court . . . in error on appeal for a matter not presented to it for decision." *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985).

### V. Whether the chancellor erred in ordering Gerald, as trustee of the family trust, to transfer the Elvis property out of the trust.

¶72. Gerald argues that the terms of the trusts and the statutes of Mississippi and Tennessee granted him plenary power to act as trustee of the family trust. However, by the time the chancellor ordered him to transfer the Elvis property from the marital trust to its beneficiaries (October 11, 2007), he had been removed as trustee and remained only as acting trustee. He was limited by order of the trial court to rent-collection and other day-to-day functions, and was specifically enjoined from negotiation for the sale of the Elvis property or going onto or about the property.

¶73. Gerald argues further that (1) transferring the property would deplete the family trust of its assets, leaving him unable to pay the fees and expenses to be assessed against the trust; and (2) pending litigation would affect the ultimate disposition of the family trust. Colleen's estate argues that Colleen exercised her right under the family trust to exclude Gerald and leave it to her other three sons. In the order directing the transfer of the property, the chancellor adequately protected Gerald's claim, pending the outcome of the litigation over Colleen's estate. We find no abuse of discretion in the chancellor's order.

### VI. Whether the chancellor erred in denying prejudgment interest upon the judgments awarded to William's estate.

¶74. Gerald cites breach-of-contract cases in attempting to show that the trial court abused its discretion in denying prejudgment interest on the judgments for the loans to Dennis and Shannon. *See Sunburst Bank v. Keith*, 648 So. 2d 1147, 1152 (Miss. 1995); *Cain v. Cain*, 967 So. 2d 654, 663 (Miss. Ct. App. 2007); *Estate of Baxter v. Shaw Associates., Inc.*, 797 So. 2d 396, 403, 407 (Miss. Ct. App. 2001). Gerald argues that these cases show that the amounts owed had become liquidated, and thus payable, requiring an order for prejudgment interest.

¶75. The discretion to award or deny prejudgment interest rested with the chancellor. A trial court may award prejudgment interest provided certain conditions are met, but is not required to do so. *See Stockstill v. Gammill*, 943 So. 2d 35, 50 (Miss. 2006); *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 286 (Miss. 2005); *USF&G Co. v. Conservatorship of Melson*, 809 So. 2d 647, 661-62 (Miss. 2002). This Court has stated:

> An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith. No award of prejudgment interest may rationally be made where the principal amount has not been fixed prior to judgment.

*Upchurch Plumbing, Inc. v. Greenwood Utilities. Comm'n*, 964 So. 2d 1100, 1117 (Miss. 2007) (quoting *Coho Res., Inc. v. McCarthy*, 829 So. 2d 1, 19-20 (Miss. 2002).

¶76. Dennis and Shannon claimed, and Gerald admitted, that he had never requested that they begin repayment of the loans, *i.e.*, no "claim [was] originally made." *Upchurch Plumbing*, 964 So. 2d at 1117. As the chancellor had the discretion to deny prejudgment interest, we find no abuse of discretion.

38

**VII. Whether the chancellor erred in denying Gerald's motion for order requiring Dennis, individually and as coexecutor of Colleen's estate, to account for estate funds and property.**

¶77. Gerald argues that Dennis (as a coexecutor of the estate of Colleen, who herself was a coexecutor of William's estate) was required to settle Colleen's accounts in the administration of William's estate. *See* Miss. Code Ann. § 91-7-69 (Rev. 2004). "The executor of an executor . . . shall settle the accounts of his testator . . . in the administration of the first estate, and for that purpose shall be amenable to the jurisdiction of the court." ***Id.*** Further, according to Gerald, the chancellor was without discretion to excuse Dennis from this duty. *See **Hayes v. Nat'l Sur. Co.***, 169 Miss. 676, 153 So. 515 (1934). The ***Hayes*** Court held the following:

> [W]hatever might be said by way of extenuation in a particular case of the failure of an administrator of an administrator to settle the accounts of his intestate in the administration of the first estate, there is no authority in any court either to excuse the performance of that duty or to waive the consequences thereof.

*Id.* at 520. Gerald argues now that Dennis embezzled funds from William's estate, thus making him liable to the actions of persons aggrieved. *See* Miss. Code Ann. § 91-7-249 (Rev. 2004). However, prior to this appeal, Gerald has never denied that the funds Dennis received were loans to be repaid. Thus, this portion of Gerald's argument will not be considered.

¶78. Even assuming that ***Hayes*** controls here, Gerald's argument is without merit. *See **Hayes***, 153 So. at 515. In ***Hayes***, a man left a large estate. His administrator died less than a year later, after spending nearly all of the estate assets. *Id.* at 518-19. The administrator of the second man's estate was himself gravely ill, never made a report, and died before he

39

was able to "to find out 'what it was all about.'" *Id.* at 519-20. Here, Dennis was called to account. The chancellor had available to him the bank records of the new rental account and a summary of all receipts and expenditures. Further, Dennis testified and was cross-examined regarding his actions.

¶79. In denying Gerald's motion, the chancellor stated, "There's got to be an end to this somewhere certainly. I would think that that was litigated, discussed, testified to under oath." We find no abuse of discretion in the denial of Gerald's motion.

### VIII. Whether the chancellor erred in denying Colleen's estate's motion to allow payment of estate taxes from marital trust funds rather than from her estate's funds.

¶80. Colleen's estate argues that the chancellor erred legally by granting Gerald's motion to enforce the provision in William's living trust expressing his desire for the payment of "[a]ny inheritance, estate, or other death taxes payable by reason of [Colleen]'s death" from Colleen's assets outside the marital trust. Colleen's estate filed a motion to direct payment from the marital trust and a motion to alter or amend the chancellor's order. Both were denied without explanation.

¶81. Under the provisions of William's living trust, his property was to be split into a family trust and a marital trust. The family, or "bypass," trust was set up to hold the amount that could pass free of estate tax ($1,000,000 in 2002). The marital, or "Q-TIP," trust was set up to hold the remainder of the estate. It qualified for an unlimited marital deduction on federal estate taxes. Thus, no tax was due at the time of William's death. *See* 26 U.S.C.A. § 2056(b)(7) (2006). However, the Internal Revenue Code ("IRC") provides that, if, at the time of the second spouse's death, the inclusion of the marital trust in her estate makes it

40

exceed the amount that can pass free of estate tax, her estate is required to pay the tax. *See* 26 U.S.C.A. § 2044 (2006).

¶82.    Another statute allows the second decedent's estate to recover from the marital trust the amount of estate tax that is payable as a result of the inclusion of the marital trust in her estate. *See* 26 U.S.C.A. § 2207A (2006). It provides the following:

> (1) In general. –  If any part of the gross estate consists of property the value of which is includible in the gross estate by reason of section 2044 (relating to certain property for which marital deduction was previously allowed), the decedent's estate shall be entitled to recover from the person receiving the property the amount by which –
>
>> (A) the total tax under this chapter which has been paid, exceeds
>
>> (B) the total tax under this chapter which would have been payable if the value of such property had not been included in the gross estate.

26 U.S.C.A. § 2207A(a) (2006). Colleen's separate assets at the time of her death totaled approximately $1,500,000.[9] The amount that could pass without estate-tax liability was $2,000,000 at that time. By including the approximate $1,900,000 from the marital trust, her estate increased to $3,400,000. She then had an estate-tax liability of approximately $630,000, owing entirely to the inclusion of the marital trust. Under section 2207A of the IRC, her estate would be able to use marital-trust assets to pay the entire amount. 26 U.S.C.A. § 2207A (2006). The same code section allows for waiver of this right to recover. *See* 26 U.S.C.A. § 2207A(a)(2) (2006). It provides:

> Decedent may otherwise direct. – Paragraph (1) shall not apply with respect to any property to the extent that the decedent in his will (or a revocable trust) specifically indicates an intent to waive any right of recovery under this

---

[9]The figures used in this scenario were provided in Colleen's estate's brief.

41

subchapter with respect to such property.

26 U.S.C.A. § 2207A(a)(2) (2006). Colleen did not waive her Section 2207A right.

¶83. Gerald argues that the settlor's intent (William's) is paramount here and that his desire should trump federal law to the contrary. Colleen's estate counters that Colleen, as the second to die, is the decedent contemplated in Section 2207A(a)(2). Colleen's estate does not dispute William's intent, but argues that it is irrelevant. Gerald also argues that a state statute should control. *See* Miss. Code Ann. § 27-10-7 (Rev. 2010). It calls for estate taxes to be "apportioned among all persons interested in the estate," but allows for the method described in the decedent's will to take precedence over the statutory method. *Id.* The parties dispute whether federal laws regarding federal taxes do or do not trump state laws to the contrary.

¶84. In the face of federal law to the contrary, William's desire regarding the apportionment of his wife's estate's tax obligations is irrelevant. As shown by the explanatory scenario in the Code of Federal Regulations, Colleen is the decedent contemplated in section 2207A(a)(2). *See* 26 C.F.R. § 20.2207A (2010). She did not waive her right to recovery under section 2207A. Thus, her estate retains this right.

¶85. We find that the dispute over the precedence of federal and state tax laws is moot, as the statutes are not in conflict. Both call for apportionment of estate tax to those interested in the estate and both allow for the decedent to direct a different apportionment in her will. *See* 26 U.S.C.A. § 2207A; Miss. Code Ann. § 27-10-7 (Rev. 2010).

¶86. If the dispute over the applicability of the Supremacy Clause is relevant, Gerald's argument is still without merit. *See* U.S. Const. art. VI, cl. 2. Colleen's estate cites an

42

Alabama case for the proposition that federal law controls regarding federal taxes. *Cleveland v. Compass Bank*, 652 So. 2d 1134, 1137-38 (Ala. 1994) (Section 2207A, having no specific provision on state taxes, does not preempt Alabama statute regarding state taxes, but does preempt regarding federal taxes). Gerald cites a case from the State of Washington. *See Eisenbach v. Schneider*, 166 P.3d 858, 863-65 (Wash. Ct. App. 2007) (citing *Riggs v. Del Drago*, 317 U.S. 95, 63 S. Ct. 109, 87 L. Ed. 106 (1942)). In *Eisenbach*, both spouses expressed their intent in a jointly prepared trust indenture that their trusts should be apportioned pro rata. *Eisenbach*, 166 P.3d at 865. The court noted that the widow, as the second decedent, had expressed her intent to waive her rights under Section 2207A. *Id.* *Riggs* is equally unhelpful to Gerald, as the Court ruled that the federal and state statutes at issue were not in conflict, thus the state law could control. *Riggs*, 317 U.S. at 97-98.

¶87. Thus, we reverse that portion of the chancellor's judgment.

> **IX.** **Whether the chancellor erred in granting fees to Brown for services provided after July 3, 2007, and in denying an award of fees to Autry for services provided after September 20, 2007.**

¶88. As noted above, attorney-fee decisions are to be affirmed unless found to be manifestly wrong. *Tupelo Redevelopment*, 972 So. 2d at 521.

*Brown's fees*

¶89. Colleen's estate argues that this Court should reverse the chancellor's award of fees, because the services rendered by Brown after the first fee award were not for the benefit of the estate. Colleen's estate charges that these fees were expended for Gerald's personal benefit, and that Gerald's continued litigation went against the interests and stated wishes of the majority of the estate's beneficiaries.

43

¶90. In December 2007, Colleen's estate moved to cut off Brown's fees. The trial court denied the motion, ordering it "denied to the extent that it seeks to discontinue [Brown's] entitlement to additional fees and expenses associated with the administration of the Estate and the Trusts in and before the Trial Court."[10]

¶91. Colleen's estate cites only one case in support of its argument. *See Clarksdale Hospital v. Wallis*, 187 Miss. 834, 193 So. 627 (1940). In *Wallis*, the Court held, "Where the services were rendered for the sole benefit of an individual . . . interested in the estate, as against the others interested, such an allowance is unauthorized." *Id.* at 628. However, the party seeking attorney fees, whose payment was contested by the executor, was the hospital. *Id.* Here, the executor of the estate is seeking his fees.

¶92. Gerald counters that, despite his removal as trustee, he remained an executor until the estate was closed. He claims correctly that, in every litigation he commenced, he prevailed and benefitted the estate. This included the disgorgement action against Autry that occurred in 2008 and benefitted the estate by more than $144,000.

¶93. We find no abuse of discretion in awarding fees to Gerald's attorney after July 2007.

*Autry's fees*

¶94. Colleen's estate concedes that "no Mississippi law exists to guide as to whether attorney's fees should be awarded under these circumstances." Without citation of any authority other than "good sense and policy," the argument continues "that attorney fees are

---

[10]As will be discussed further below, Colleen's estate requested, and the Court ordered, that Brown was not entitled to reimbursement or payment of fees regarding his notice of appeal filed in November 2007.

appropriately awarded even after the death of the executor where the fees are the direct and unavoidable result of continuing litigation begun during the lifetime of the executor." We decline to consider this argument, as it is procedurally barred. *See* Miss. R. App. P. 28(a)(6); *City of Jackson v. Harris*, 44 So. 3d 927, 935 (Miss. 2010).

> **X.     Whether the chancellor erred in failing to order postjudgment interest on the awards of attorney fees and executor commissions.**

¶95.    The chancellor did not order postjudgment interest on any of the awards of attorney fees or executor fees. The  orders granting executor fees and interim attorney fees to Gerald include blank lines for the interest rate to be entered later. Both have "0%" printed on the blank. The orders granting interim attorney fees to Billy, Dennis, and Shannon contain no mention of postjudgment interest. The order granting Colleen's executor fees and attorney fees has a typed sentence authorizing postjudgment interest at the rate of eight percent, but the entire two-line sentence is lined out and initialed. The initials are those of the four attorneys. The orders granting the final attorney-fee awards do not mention postjudgment interest.

¶96.    Colleen's estate now cites Mississippi Code Section 75-7-7 (Rev. 2002) and argues that the chancellor erred in denying postjudgment interest, a statutory right. *See **Miss. Dep't of Human Servs. v. McNeel***, 10 So. 3d 444, 460 (Miss. 2009). Shannon makes a similar argument in his brief, but Billy and Dennis do not mention postjudgment interest. Gerald responds to these arguments in his reply brief, stating that he does not challenge the right to postjudgment interest, but continues that, if the others are to get it, he wants it.

¶97.    The *McNeel* Court stated the following:

45

> This Court has stated that "post-judgment interest is a statutory right . . . ." ***Miss. Dep't of Mental Health v. Hall***, 936 So. 2d 917, 929 (Miss. 2006) (quoting ***U.S. Fidelity & Guar. Co. v. Estate of Francis ex rel. Francis***, 825 So. 2d 38, 50 (Miss. 2002)). Therefore, "[d]ue to the mandatory nature of § 75-17-7 and because public policy heavily favors post-judgment interest," ***Hall***, 936 So. 2d at 930, this Court concludes that McNeel is entitled to post-judgment interest.

***Id.*** These parties had a right to postjudgment interest, but they sat on those rights. Gerald, Dennis, and Billy did not raise the issue on appeal. No party raised this issue with the trial court. As above, this Court will not hold "a trial court . . . in error on appeal for a matter not presented to it for decision." ***Mills***, 467 So. 2d at 931. No party requested that this Court consider plain error, and we decline to conduct such an analysis.

### XI. Whether this Court should award the parties their attorney fees and expenses incurred in bringing and defending this appeal.

¶98. All parties request that this Court award attorney fees for this appeal. With the following contradictory exceptions, the trial court has not had an opportunity to rule on this issue: (1) fee payments to Colleen's estate were terminated in 2007 following her death; (2) Colleen's estate's motion to deny Gerald fees for this appeal was granted; (3) Gerald's supplemental fee request, which *did not* separate trial-court fees and appeal fees, was granted in full; (4) Shannon's supplemental fee request, which *did not* separate trial-court fees and appeal fees, was granted with a deduction for a different reason; (5) Billy's and Dennis's fee request, which *did* separate appeal fees, was granted in full, including appeal fees.

¶99. This Court may grant a motion for attorney fees where a contract provides for reasonable attorney fees and the trial court granted fees for services in the trial court. *See* ***Dixie Contractors, Inc. v. Ballard***, 249 So. 2d 653, 657 (Miss. 1971). In divorce cases in

46

which a party is found unable to pay, this Court has granted motions for attorney fees in the amount of one-half that awarded by the chancellor. *See Monroe v. Monroe*, 745 So. 2d 249, 253 (Miss. 1999). Such an award is not appropriate in this case.

¶100. With the exceptions noted above, the trial court has not had an opportunity to issue a final judgment on this issue. This Court has nothing to review regarding appeal fees for Billy, Dennis, and Shannon. Regarding Gerald's fees, the chancellor's judgment is unclear. Colleen's estate is the only party for which there exists a clear judgment subject to review by this Court. Fees to Colleen's estate were terminated following her death, and this Court has affirmed that judgment. The chancellor may consider this issue upon remand. Consistent with the instructions of this opinion, the chancellor may first determine which parties, if any, are entitled to fees for this appeal, and then determine the reasonable fee award(s), if any.

## CONCLUSION

¶101. We remand the appeal-fees issue, reverse and remand the estate-tax issue, and affirm on all other issues.

¶102. **AS TO 2007-CA-02043-SCT: ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED AND REMANDED IN PART. AS TO 2009-CA-00784-SCT: ON DIRECT APPEAL: AFFIRMED IN PART AND REMANDED IN PART. ON CROSS-APPEAL: AFFIRMED IN PART AND REMANDED IN PART.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, AND KING, JJ., CONCUR. CARLSON, P.J., NOT PARTICIPATING.**

47