DISTRIBUTORS SUPPLY COMPANY, INC., AND ANOTHER v.
ESTATE OF VICTOR F. SHABLOW AND ANOTHER.

92 N. W. (2d) 83.

June 20, 1958—Nos. 37,099, 37,100.

*Gray & Gray, Allen L. Gray,* and *Elmer Wiblishauser,* for appellants. *Olson & Holmquist,* for respondents.

KNUTSON, JUSTICE.

Victor F. Shablow, during his lifetime, was engaged in the business of custom chemical aerial spraying of farm crops in the Red River Valley. He also did considerable farming in Kittson County. He died intestate on August 7, 1954, leaving him surviving his wife, Agnes Shablow; his son Robert, aged 24; his son James, aged 17; and his daughter Judy Ann, aged 8. On a petition of Robert, Agnes Shablow was appointed administratrix of the estate of her husband on September 21, 1954, and letters of administration were issued to her on September 23. In qualifying, she gave a bond in the sum of $8,000. On September 23, an order was made by the probate court allowing Mrs. Shablow $300 per month for support and maintenance of herself and her two minor children during the settlement of the estate. Certain described personal property and the homestead of decedent were set apart to Mrs. Shablow as surviving spouse by an order of the court dated October 13, 1954. No appeal has been taken from that order. At the time these orders were made, it was thought that the estate was solvent.

An inventory was filed on January 8, 1955, in which the property listed therein was appraised at $27,465, of which $3,220 is the net value of real estate and the balance is personal property consisting mainly of farm machinery—encumbered for nearly its entire worth—, book accounts, and cash. The book accounts were appraised at $18,000. The property listed was appraised by Bernard Locken and Phillip Peterson, who signed the oath of appraisers as part of the inventory on December 14, 1954. Claims were filed and allowed aggregating somewhat over $28,000. Among the claims filed and allowed were two claims of appellants aggregating $7,557.25.

When it appeared that the estate in all probability was insolvent, all nonexempt real and personal property was sold at public auction to the highest bidder. Thereafter, on May 3, 1955, the administratrix petitioned

for leave to pay 50 percent of all claims, which was ordered by the probate court. Thereupon all claimants, including appellants, were paid 50 percent of their claims.

On February 14, 1955, one of the creditors filed a petition for removal of Mrs. Shablow as administratrix and for removal of the appraisers, who, the petition states, were appointed by the court on December 14, 1954. Appellants filed a similar petition shortly thereafter. After a hearing, these petitions were denied by the probate court. In so doing, the court said in its order:

"* * * the Administratrix having duly performed all of her duties as such Administratrix to the best of her ability, without any fraud, deceit or appropriation to her own use of any of the properties of said estate, and having duly kept a complete bank account of all receipts and disbursements which she had made up to the time of said hearing and including the day of said hearing, and there being no evidence whatever of any willful intent on the part of the said Administratrix to willfully conceal from the creditors or deprive the creditors of any of their rights to any of the property involved in said estate, and it further appearing that the said Administratrix has made a complete, honest and fair disclosure of all property holdings to the best of her knowledge, information and ability and that the same will all be duly reported in the final account,

"IT IS ORDERED, that said petitions with respect to the prayer for removal of said Administratrix be and the same is hereby in all things denied."

On August 5, 1955, the administratrix filed her final account. Objections to the account were filed by appellants. After a hearing, the account was allowed, with some minor adjustments. The account as allowed may be summarized as follows:

| | |
|---|---|
| Total receipts | $ 53,417.23 |
| Disbursements: | |
| Personal property selected by surviving spouse $ | 1,200.00 |
| Maintenance of family | 3,600.00 |
| Expenses of administration | 8,188.56 |
| Expenditures of decedent's family | 562.45 |

4

| | |
|---|---:|
| Expenses of last sickness | 1,438.77 |
| Funeral expenses | 795.00 |
| Taxes | 1,258.40 |
| Claims of creditors[1] | 17,574.46 |
| General claims, 50 percent paid | 13,528.85 |
| Residue of personal property for distribution | 5,270.74 |
| Total | $ 53,417.23 |

Of the residue of personal property on hand, the order of the court shows:

| | |
|---|---:|
| Uncollected accounts receivable | $ 619.00 |
| Cash on deposit | 3,488.70 |
| Deficiency surcharged to administratrix | 1,163.04 |
| Total | $ 5,270.74 |

An appeal thereafter was perfected to the district court. After the case had been tried for two days, the parties entered into a stipulation in open court as follows:

"* * * it has been stipulated by the parties that without further evidence being taken, the account of the administratrix may be surcharged in the amount of $17,299.93, which surcharged amount will be in addition to that amount which the Probate Court ordered the account of the representative to be surcharged; that the said figure of $17,299.93 is composed of the following items: unlawful and improper charges made by the administratrix against the estate in the following respects:

| | |
|---|---:|
| "Appraisers' fees | $ 20.00 |
| "Payments made to James Shablow, the minor son of the administratrix | 440.00 |
| "Payment made to Danielson Garage, attributed to harvesting and auction expense | 100.00 |
| "Payments made on alleged claims of creditors | 3,541.53 |
| "The Karlstad Bank account claimed by the administratrix, Agnes Shablow, to be a joint account | 4,267.40 |

---

[1]Secured claims allowed by the court.

"The crop allowance from the estate to Agnes Shablow personally 1,959.00

"Payments made to Agnes Shablow on accounts purchased by her and assigned to her and filed by her as claims against the estate 191.00

"Other excessive harvesting and auction expense 1,631.00

"Payments improperly made to son Robert Shablow 900.00

"Disallowance of Administratrix's compensation 3,000.00

"Attorney fees charged in Administratrix's account and allowed by the Probate Court, and by stipulation disallowed 1,250.00"

Appellants contend that they have brought into the estate the amount surcharged to the administratrix's account under this stipulation. Respondents contend that the stipulation was entered into in order to create enough paper assets in the estate so that appellants' claims could be paid in full. Based on the contention that they had benefited the estate to the extent of the assets covered by the stipulation, appellants asked the court to allow them an attorneys' fee of $6,000 to be paid out of the assets of the estate. The court allowed them $1,000, plus $450 expenses. This appeal involves only the propriety of the court's allowance of attorneys' fees. Appellants will be paid their claims in full, so they are not aggrieved by the order. In their brief, counsel for appellants state:

"* * * The gist of this appeal to the Supreme Court is in connection with the inadequate allowance of attorneys' fees to the extent of $1,000.00."

Appellants seek to invoke the rule applicable to trust estates and, for the most part, rely upon In re Living Trust Created by Atwood, 227 Minn. 495, 35 N. W. (2d) 736, 9 A. L. R. (2d) 1126, and other cases involving the allowance of attorneys' fees out of trust estates. These cases are not in point. In the first place, the same rule does not prevail in trust estates as prevails in the case of estates of deceased persons. The rule applicable to trust estates is annotated in Annotation, 9 A. L. R. (2d) 1140. The rule applicable to decedent's estates is annotated in Annotations, 79 A. L. R. 521 and 142 A. L. R. 1459. In

6

addition to that, the Atwood case is distinguishable on the facts. In that case we said (227 Minn. 498, 35 N. W. [2d] 739, 9 A. L. R. [2d] 1129):

"* * * (a) the terms of the trust instrument were ambiguous and uncertain in meaning and that they had been construed at different times in different ways; (b) that litigation was necessary to resolve these ambiguities in meaning as a prerequisite to a determination of the present and future rights of all parties concerned; (c) that respondent in his representative capacity was a necessary and proper party to this litigation; (d) *that all litigation in which respondent participated and all the legal services performed and expenses incurred in connection therewith were necessary and proper and were of benefit to all the beneficiaries and to the trustees in resolving the trust-instrument ambiguities and in procuring a final adjudication of the respective rights of the beneficiaries and of the duties of the trustees;* * * *." (Italics supplied.)

With respect to the allowance of attorneys' fees we said (227 Minn. 500, 35 N. W. [2d] 740, 9 A. L. R. [2d] 1131):

"* * * It is * * * recognized that costs and attorneys' fees may be allowed out of the trust estate to any necessary party who is acting primarily for the benefit of the estate in securing a clarification of ambiguous trust-instrument language where a reasonable doubt as to its meaning exists. [Citing cases.] In such cases, the litigation is indispensable to the proper administration of the trust and is a proper charge thereon. If the issues are immaterial or trifling, or if the conduct of a party is vexatious and litigious, or if he raises improper points, or in any way creates unnecessary delay or expense, the court will not only refuse him costs and counsel fees, but will order him to pay costs. * * * In short, there must be reasonable grounds for instituting the litigation, and it must be conducted with dispatch and in good faith."

In this case there is no finding by the trial court, as there was in the Atwood case, that the services of appellants' attorneys were all for the benefit of the estate. As a matter of fact, the trial court was of exactly the opposite opinion. In its memorandum it said:

"* * * the Court does not * * * find that the total amount of the surcharge of the representative has hereby accrued as a benefit to the estate."

The court also said:

"* * * Much time has undoubtedly been consumed in the pursuit of trifles, personal arguments, immaterial matters and abstract legal principles which, while time-consuming, produced no real benefit to the estate."

The case was not tried to completion. The trial court had no opportunity to determine whether the claims of appellants were sustained by the evidence or not. In its memorandum the trial court said:

"As the hearing on the instant appeal did not proceed to final completion, this Court is not in a position to properly appraise and pass judgment upon the doings of the representative in the administration of her husband's estate."

While the record is not nearly as complete as it should have been in showing what transpired when the case finally came to an end, it does appear that, after Mrs. Shablow had been subjected to two days' examination, much of which consisted of an aggressive cross-examination by appellants' counsel, a stipulation was entered into providing that her account could be surcharged with the items mentioned above. Counsel for respondents claim that prior thereto she had been subjected to several days' examination in the probate court, and, while the record does not show that, it is reasonable to assume that it is true. Counsel for respondents claim that, as a result of this aggressive cross-examination to which Mrs. Shablow was subjected, she had a breakdown and could not go on with the hearing. While the record fails to show what happened, the trial court intimates as much. Again, in its memorandum it said:

"* * * In conferences had by counsel and the Court it was represented that the respondents could not further proceed without endangering the representative's health, and that in order to obviate the necessity of further hearings they would be willing to stipulate to a surcharge of the representative's account upon the items in dispute *in an amount suf-*

*ficiently large so as to insure the payment in full to the creditors of the estate."* (Italics supplied.)

Prior to the commencement of the action in district court, appellants were advised of the fact that all creditors had assigned the balance of their claims to the representative's sister, with the exception of appellants and other creditors with small claims. For the most part the claims were assigned to her, undoubtedly for the benefit of Mrs. Shablow, gratuitously. All creditors had been paid 50 percent. The unpaid balance of all claims, except those of appellants, amounted to some $9,000. Mrs. Shablow's sister paid out $343.90 to acquire assignments of all of them. By far the majority of the creditors simply gave the balance due them to respondents. It is quite obvious that all creditors realized that, if they insisted upon payment, Mrs. Shablow would be left with very little property and out of the goodness of their hearts simply gave her the balance of their claims. Appellants were not so charitable. Of course, they had a right to insist on payment, but the action of other creditors should be kept in mind in determining whether the services of appellants' counsel were of any benefit to anyone but themselves, particularly in view of the fact that they had full knowledge of these assignments prior to the commencement of the trial of this appeal. It seems obvious that the trial court correctly stated the purpose of the stipulation and that it was intended to create enough paper assets so that appellants' claims could be paid in full regardless of the merits of the various objections to the allowances included in the stipulation.

The general rule with respect to the right of a court to allow fees to an attorney out of the assets of the estate of a decedent is that, absent a statute, no allowance may be made out of the estate of a deceased person for services rendered by an attorney employed by the creditors of the estate where the attorneys have acted solely for the creditors and without being employed by the personal representative of the estate.[2]

Appellants' right to fees, if it exists at all, is based on M. S. A. 525.49, which as far as material here reads:

---

[2] 21 Am. Jur., Executors and Administrators, § 548; 34 C. J. S., Executors and Administrators, § 941; Annotations, 79 A. L. R. 529, 142 A. L. R. 1465.

"* * * Where, upon demand the representative refuses to prosecute or pursue a claim or asset of the estate or a claim is made against him on behalf of the estate and any party interested shall then by his own attorney prosecute or pursue and recover such fund or asset for the benefit of the estate, such attorney shall be allowed such compensation out of the estate as the court shall deem just and reasonable and *commensurate with the benefit to the estate from the recovery so made.*" (Italics supplied.)

■ Of paramount importance under this statute is a determination of the benefit to the estate of the services rendered. Absent such benefit, no fees may be allowed. The amount of fees to be allowed, if any, must be commensurate with the benefit. Even under this statute the right to allow fees should be cautiously exercised. In Becht v. Miller, 279 Mich. 629, 638, 273 N. W. 294, 298, the Michigan court, in a case of this kind, said:

"A doctrine which permits a decedent's estate to be so charged, should, however, in our opinion, be applied with caution and its operation limited to those cases in which the services performed have not only been distinctly beneficial to the estate, but became necessary either by reason of laches, negligence or fraud of the legal representative of the estate."

Appellants contend that minimum fees adopted by the Hennepin and Ramsey County Bar Associations should be used as criteria of the value of the services of their attorneys. Even assuming that the services were as extensive as they claim, such schedules are not of much value in determining what should be allowed in a case of this kind. These fee schedules are intended as guides in determining the value of services of an attorney to his client. No attorney-client relationship exists here. Neither the heirs nor the representative of the estate, nor any of the creditors aside from appellants, have ever requested the services of appellants' attorneys, nor are they interested in having such services performed. They have been retained and have worked exclusively as attorneys for appellants for the purpose of collecting a claim against the estate. Counsels' interests at all times have been adverse to the estate and the representative thereof.

Many of the items which appellants claim to have recovered in this case cannot be considered to be a claim of the estate nor a recovery of a fund or asset of the estate which the representative has refused to prosecute, as is contemplated by our statute. It is clearly within the contemplation of this statutory provision that the fees to be allowed, if any, are largely within the discretion of the trial court and that they must be commensurate with the benefit to the estate. It seems clear that what the statute contemplates is a recovery of some asset or fund which the representative either has refused to pursue or has failed to recover; which has been brought into the estate for the benefit of the heirs and those interested in the estate; and which otherwise would not have been there.

With these observations in mind, we have but to look at the items included in the stipulation to determine that many, if not all thereof, are not such as are within the contemplation of the statute. The stipulation, which is far from a model in expressing the intention of the parties, was orally dictated to the reporter by appellants' counsel with little, if any, attempt on the part of respondents' counsel to have the record reflect the real purpose of the stipulation.

In addition to the specific items mentioned in the stipulation, it provided that the court could consider whether the estate had a beneficial interest in certain real estate known as the Lofgren property, which will be discussed hereinafter, and a possible interest in a homestead set aside to the surviving spouse in the event it found that the acreage so set aside exceeded that permitted by the statute. The trial court found that the order setting aside the homestead was an appealable order and that, inasmuch as the time for appealing had gone by, it was not within the jurisdiction of the court to consider that order.

Based upon the stipulation so entered, the trial court found that $21,120.67 was now available in the estate for the purpose of paying creditors and closing the estate. This amount, however, includes the amount covered by the stipulation, and, in determining whether the ultimate outcome of the estate reflects any benefit due to the services of the attorneys for appellants, we should not lose sight of the outcome which would have been probable as to these items if the case had been carried to completion, nor should we lose sight of the purpose for

which this stipulation was entered into.

An examination of the various items included in the surcharge provided by this stipulation discloses that many of the items would in all probability have been disallowed if the case had gone to completion. Many are entirely lacking in merit, and others are based purely upon a technicality which indicates the nature of this entire proceeding. The trial court was familiar with the purpose of the stipulation and also must have had in mind what probably would have been allowed if the case had gone to completion and, therefore, was in a much better position than we are to evaluate the benefit of the services of appellants' attorneys to the estate, if there was any benefit.

A brief examination of the items included in the surcharge may be of help.

The first item consists of $20 paid as appraisers' fees. No one disputes the fact that these appraisers did their work and earned their fees. As a matter of fact, they signed the oath of office on the inventory and also the certificate of appraisers, which recites on its face that they have been "duly appointed by the Probate Court." In a petition filed for their removal, appellants, as well as the attorney for another creditor, said: "* * * that this Court has appointed and received the oath of office from two appraisers, to-wit: Bernard Locken and Phillip Peterson." Apparently, thereafter, counsel for appellants discovered that in some unexplainable manner the probate court had failed to make and file an order appointing such appraisers. If the petition of appellants had been granted and the appraisers had been removed and new appraisers appointed, obviously such appraisers would have been entitled to be paid their fees, probably much larger than the fees paid these appraisers.

The next item is a payment of $440 to James Shablow, a 17-year-old son of the administratrix. The evidence shows that James Shablow performed services for the estate in harvesting crops on the land which the estate owned and in preparing the land for the next year's cropping. No one has disputed the fact that he did much work of this kind. Appellants claim, however, that, inasmuch as he was a member of the family for the support of which the probate court had made an allowance, he was not entitled to be paid for work which he did for the estate. There

is absolutely no merit in this claim. Possibly Mrs. Shablow was entitled to the services of her minor son gratuitously, but certainly the creditors of the estate had no such right. He was as much entitled to be paid for his services as any other employee who worked for the estate. As a matter of fact, the examination of Mrs. Shablow with respect to this item shows the nature of the examination to which she was subjected. No less than 15 pages of the printed record are devoted to an examination of Mrs. Shablow in an effort to show the impropriety of the payment to James for work he had done for the estate.

Another item in the stipulation consists of $900 paid to Robert Shablow for services and work he did for the estate. Robert Shablow was a 24-year-old son, married and with a family of his own. He had worked for his father before his untimely death, for wages, as a pilot on airplanes, on the farms, and wherever he was needed. It is extremely doubtful that if the case had gone to completion any part of the $900 payment would have been found improper.

Next is an item of $100 paid Danielson Garage for harvesting and auction expense. The record is not too clear what the situation was with respect to this item. It is not large, and no further time will be spent on it.

One of the large claims consists of $3,541.53 paid by Mrs. Shablow to creditors, both before and after she was appointed administratrix. It is undisputed that the claims were owing. The technical difficulty is that she paid these claims without requiring them to be filed and allowed by the probate court. That she acted in good faith can hardly be denied. She applied to the court for an order authorizing reimbursement to herself of these items, and the court made such order. Technically, probably it was improper to pay them. If they had been filed, there is little doubt they would have been allowed. Many of them were for labor performed for Mr. Shablow during his lifetime. If Mrs. Shablow had taken assignments of them, she could in all probability have filed them and been reimbursed. What she did she did upon the advice of her then attorney, and there is no evidence that she acted in bad faith. After a full disclosure to the probate court, she was permitted to reimburse herself.

The largest item in the stipulation consists of a joint checking account

of $4,267.40, which Mrs. Shablow believed she owned. The checking account of Mr. Shablow and his wife had been carried in the Karlstad bank as a joint account since 1951. Both parties drew on the account by their personal checks. Mrs. Shablow, while she had no independent income, worked with her husband in keeping the books and records and assisting him where she could. After his death, she was advised by her attorney that this money belonged to her as the surviving owner of a joint account. The matter was fully submitted to the probate court, and the judge agreed. It was not fully developed at the trial, but, as far as the case went, the outcome of this item is exceedingly doubtful. On the face of it, it can easily be understood how Mrs. Shablow believed that she owned this account as the surviving owner of the joint account.

The next item consists of the proceeds of a crop amounting to $1,959, which came from the so-called Lofgren property. It is doubtful that the probate court, or the trial court on appeal, had jurisdiction to determine title to this property or to this crop, but, assuming that it did, the facts are far from clear in establishing that the estate owned this property. The Lofgren property consists of 160 acres of submarginal land in a part of Kittson County where land is of little value. It was purchased by Mr. Shablow from Lofgren on an oral contract for the sum of $500 for the entire quarter section. Prior to his death, Mr. Shablow had paid $200 on the oral contract. He had no memorandum in writing of any kind. He planted a crop on a part of the farm, and, after his death, Mrs. Shablow, on advice of her counsel, paid the balance of $300 and procured a deed from Lofgren running to her as grantee. She testified that it had been the intention of her husband, if he had completed this purchase, to have the deed run to himself and his wife as joint tenants. There is no contradiction of this testimony. If this had been completed, obviously she would have been the owner of the farm upon his death. She was the owner as a joint tenant with him of other land. In any event, she was prima facie the owner by virtue of the deed, and the interest which the estate had in this farm, if any, is far from clear. With the title to the land went the crops which were unsevered at the time Mr. Shablow died. It so happened that in this particular year this submarginal farm produced crops far above the average. A determined effort was made by counsel for appellants to

get Mrs. Shablow to admit that the farm was worth considerably more than it was, but the fact that the whole farm was purchased for $500 is demonstrative evidence of the value of the land. There is a serious doubt whether appellants could have established title to this item.

There are a few other small items, including a payment of $191 made by Mrs. Shablow for claims against the estate for which she took assignments and then filed the claims in order to get reimbursement. If she had done that with the large claim of $3,541.53, there probably could have been no objection to it as long as she did not derive any benefit from the transaction personally.

Outside of these claims, appellants claim credit for a surcharge of $3,000 for disallowance of compensation to the administratrix, which had been paid to her under authority of the probate court, and $1,250 allowed to her for attorneys' fees for her original attorney by the probate court. While the propriety of these allowances may not be too important, it is doubtful if it can be considered the pursuit of a claim under § 525.49. Furthermore, if the case had been tried to completion, it is doubtful if the trial court would have disallowed these fees or at least all of them. While there are many things in the administration of this estate which are subject to criticism, in all probability because of advice received by Mrs. Shablow from her original attorney and her ignorance of the manner in which an estate should be handled and not because of any bad faith on her part, the record shows conclusively that she did a great deal of work for the estate of considerable value. When Mr. Shablow died, the principal asset of the estate consisted of numerous book accounts or bills receivable representing amounts owing to him for aerial spraying of crops on farms spread over a territory from Pembina, North Dakota, to Ada, Minnesota. The total amount of these claims was over $30,000. While appellants' attorneys subjected Mrs. Shablow to an extensive cross-examination in seeking to show some impropriety in listing these claims in the inventory as having a value of only $18,000, Mrs. Shablow told an officer of appellants even before her husband's death that the gross amount of these bills receivable was somewhere around $30,000. She attempted to explain to appellants' attorneys, to little avail, that they had been listed in the inventory at $18,000 upon the advice of her attorney because at that time they had

no knowledge as to how much could be collected on these accounts. However, the record shows conclusively that Mrs. Shablow, with her own automobile and paying her own traveling expenses, singlehandedly went out and personally collected every one of the accounts in full, with the exception of two or three small accounts. All the money was deposited in the estate account, and there is no claim otherwise. Even so, at the time of the trial, appellants' counsel, with full knowledge of the fact that Mrs. Shablow had accounted in full for all this money, attempted to show some impropriety in listing the accounts in the inventory at $18,000, even though that fact was at that time wholly immaterial. In addition to collecting these accounts, Mrs. Shablow arranged for a sale by auction of all personal property and real estate belonging to the estate. Here, again, counsel for appellants sought to show an impropriety in failing to include a few isolated pieces of farm machinery, of little value, in the inventory, even though they then had full knowledge of the fact that all of such property was sold at the auction sale and that the proceeds went into the estate account. It is doubtful that the trial court would have disallowed all fees to Mrs. Shablow as representative and to her original attorney if the case had been carried to completion.

Much more could be said, but it seems obvious that the purpose of entering into the stipulation involved in this case was to enable appellants to be paid their claims in full. It should not be construed as an admission that appellants have recovered these assets, if they are such, for the benefit of the estate. Only two classes of persons were interested in this estate, namely, the heirs consisting of Mrs. Shablow; her two sons; her daughter; and the creditors of the estate. It is evident that the family as a unit will not receive a single dollar that they would not have had without counsel services. Neither will any creditor, except appellants and a few others having small claims, receive any benefit from such services. By virtue of fictitious assets created by this stipulation of the parties, counsel have been successful in collecting their clients' claims in full. For that the court has allowed them a fee of $1,000 out of the assets of the estate, plus $450 expenses. It is reasonable to assume that they will also be paid by their clients. It may be argued that, inasmuch as assignments of the other claims were taken in the name of

Mrs. Shablow's sister, they are still claims against the estate, but we do not need to be so unrealistic as to believe that Mrs. Shablow's sister, who lives with her as part of her family, has any intention of pursuing these claims or collecting them at the expense of her sister. Obviously, the assignments were taken only as a protection to Mrs. Shablow, and the record so shows.

■ The matter of allowance of fees in a case of this kind should be left largely to the discretion of the trial court. Unless there is a clear abuse of discretion, we, as an appellate court, should not set our judgment up as superior to that of the trial judge, who was present at the time the various transactions took place and is much more familiar with them than we are. In this case, as has been said, the trial was not carried through to completion. The purpose of the stipulation can be better appraised by the trial judge than by us. We should be mindful of the admonition of this court in In re Living Trust Created by Atwood, 227 Minn. 495, 502, 35 N. W. (2d) 736, 741, 9 A. L. R. (2d) 1126, 1132, where we said:

"It is the duty of courts in fixing reasonable attorneys' fees as a charge against the trust corpus to protect trust estates from 'vicarious generosity.' "

It might be said that appellants rely upon some statements made by the trial court at the completion of the trial. The record discloses that the trial court did indulge in some loose talk at that time before he had given the case thorough consideration, but his impressions after considering the evidence and the whole matter are reflected in the memorandum attached to his order, and it would seem that we should rely upon the memorandum and the statements therein rather than on spontaneous statements made at the close of the trial.

It appears to us that the allowance made, if anything, is generous for any benefit which may have come to this estate from the services rendered by appellants' attorneys. We find no abuse of discretion.

Affirmed.

Frank T. Gallagher, Justice (dissenting).

I cannot agree with the majority.

To begin with, the appellants in this case had a claim against the

estate for something in excess of $7,000. In the ordinary course of events, for the purpose of securing payment of this claim, the attorneys would have been concerned only with establishing the validity of the claim and its relative priority to other claims. The validity of this claim, however, has never been disputed by the estate nor has there ever been any doubt that it was a general unsecured claim against the estate. However, in the matter before us the entire efforts of the attorneys for appellants were directed toward securing a proper administration of the estate; that is, toward seeing that sufficient funds were either left in the estate or replaced in the estate for the purpose of satisfying not only appellants' claims but all the claims. Thus, while it is true that these attorneys were attempting to secure payment of their clients' claim, in order to do so they had to perform a function entirely apart from that which an attorney for a claimant should properly have to perform; namely, the securing of a proper administration of the estate.

In connection with this the following facts must be pointed out: This estate was improperly administered; there would have been sufficient funds in the estate from the beginning to pay all of the outstanding claims against it; and there were grounds for suspicion on the part of appellants' attorneys. Following the taking of evidence, the court stated from the bench:

"* * * Creditors and all parties interested in an estate have a right to rely upon and expect that the administration shall be had honestly and fairly in accordance with the statutory provisions. Whether Mr. Gray has been unduly suspicious or not isn't the concern of this Court. The evidence is clear that there was ground for suspicion."

In fact her own attorney characterized this proceeding when he stated:

"* * * I submit to the Court very respectfully that, regardless of his efforts, Mrs. Shablow would have, before she made her final account, come clean with absolutely everything; and I should not use the words 'come clean' because I feel that she fully intended to make a full and complete account at all times. It was not her intention to conceal anything. Had they been a little more patient, in the end they would have received what was justly due them."

A person holding a claim against an estate should not have to retain attorneys for the sole purpose of securing a proper administration of that estate, and, when this is necessary, it should not be said that the attorneys' efforts were not for the benefit of the estate. A contrary view in my opinion would deprive M. S. A. 525.49 of one of its most useful attributes.

The majority states that § 525.49 contemplates a recovery "of some asset or fund which the representative either has refused to pursue or has failed to recover; which has been brought into the estate for the benefit of the heirs and those interested in the estate; and which otherwise would not have been there." The record here seems clear that the stipulation covers assets or money that remained in the estate or had to be replaced by the administratrix. This of course plainly represents an asset in the estate which, but for the services of the attorneys in question, would not have been there. Apart from this, however, the applicability of this statute to the set of facts presented here is not an issue. The parties in effect stipulated that the statute applied to these facts and the trial court held that the statute applied. No proceedings have been taken to vacate or void the stipulation nor has a cross-appeal been taken challenging this holding.

With reference to the intent of the parties it is my opinion there are no ambiguities in the stipulation. It provides very clearly, among other things, that definite sums of money would be surcharged to the account of the administratrix. The only doubt that arises in connection with this stipulation is with respect to the subjective reasons of the administratrix for becoming a party to it. This doubt is raised only by collateral representations made by her attorney after the stipulation was made and absolutely unsupported by any evidence in the record. The stipulation itself covered many of the issues that had been raised in this action. These issues were resolved by mutual agreement, therefore it does not seem proper for the majority to go behind this stipulation. Yet the majority sets forth many of the issues covered clearly by the stipulation and one by one indicates a decision contrary to the stipulation. These issues were not fully tried, much less argued and briefed, so it seems to me that it would be mere speculation and conjecture as to the outcome of those issues if they had been tried. Besides, it would

seem that a dangerous precedent would be set to indicate what this court's decision would be on issues before they have been tried, argued, or briefed. For these reasons it would seem improper to discuss the merits of these issues.

The last comment necessary concerns the majority treatment of the assignment of claims to the administratrix's sister. It seems to be taking judicial notice of the fact that one sister will not present a legal claim against another sister.

This court has no judicial right to use such an assumption in arriving at its decision. If these claims were completely dead, as seems to be contended by the majority, one might well be justified in asking why they were not released in the first place rather than being assigned to the sister. In answer to this question it may well be inferred that someone intended to keep these claims alive for certain purposes. In other words the inference would be justified that when these claims were assigned there were circumstances under which the sister would have asserted the claims. It may well have been planned to assert the claims if the appellants had not brought into the estate a sufficient amount to pay all of the claims. The result of asserting the sister's claims in such a situation would have been to prevent the appellants from being paid in full as they would then have had to share the assets pro rata with her.

The only issue raised on appeal here was whether under § 525.49 the court allowed as compensation such attorneys' fees out of the estate as are just and reasonable and commensurate with the benefit to the estate.

In the instant case after a full trial before the probate court on objections to the final account there was still not a sufficient amount to pay the claims in full of any of the creditors. Thus after already having spent a great deal of time preparing for complicated issues it would be necessary to benefit the estate by retaining in the estate or bringing back into the estate an amount sufficient to pay all of the creditors.

Before the case went to trial in the district court the administratrix's sister had received an assignment of essentially all of the claims of the creditors other than the appellants.

However, it is clear that appellants' attorneys even at this point would have had to benefit the estate in an amount sufficient to pay all

of the claims, even those held by the sister, in order to receive payment in full of appellants' claims. In this connection appellants contended that the accounts of the administratrix should have been surcharged in excess of $17,000 over and above what the probate court had already surcharged her account. The appellants by way of stipulation prevailed in this contention.

The majority opinion would now treat the situation as though appellants had not prevailed, which is contrary to the stipulation. It is evident that the issues were complicated and one of appellants' attorneys stated as an officer of the court, which statement was uncontradicted, that they had spent 25 full days on the case, 7 of which had been taken up with hearings.

We recognize that in awarding attorneys' fees the courts must be ever watchful not to make awards or allowances that are so high as to be unreasonable, unconscionable, or unfair to the clients served. At the same time it seems to me that it is our duty as a court when called upon to review such awards to take into consideration the ability and experience of the lawyers performing the duties, the work done, hours involved, and the results accomplished. Too often clients have little knowledge of the many hours of preparation, research, investigation, and consultation which is performed by attorneys in connection with the trial of a lawsuit or in handling other legal matters. The result is that often the client bases the value of such services on the few consultations he may have had with the attorney involving the matter under consideration. If fees were to be determined on that basis it would be a simple matter to jeopardize the efficiency of our legal system. When that occurs the rights of a client are also jeopardized.

It is my opinion under the record in this case that $2,500 attorneys' fees would be a reasonable allowance.

For the above reasons I respectfully dissent from the majority.

MURPHY, JUSTICE (dissenting).

I agree with the dissenting opinion of Mr. Justice Frank T. Gallagher.

THOMAS GALLAGHER, JUSTICE (dissenting).

I agree with the dissenting opinion of Mr. Justice Frank T. Gallagher.