# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01052-SCT

*IN THE MATTER OF THE ESTATE OF BARRY C.
BLACKBURN, SR., DECEASED: JUNE HOLLEY
OLIN, EXECUTRIX OF BARRY C. BLACKBURN,
JR.*

*v.*

*GINGER RICHARDS AND KIMBERLY ARCHER,
CO-EXECUTRIX AND CO-TRUSTEES OF THE
BARRY C. BLACKBURN, SR., REVOCABLE
LIVING TRUST*

*AND*

*HARPETH PRESBYTERIAN CHURCH, INC.,
NASHVILLE CHRISTIAN SCHOOL, INC., THE
UNIVERSITY OF MISSISSIPPI AND BOYKIN
SPANIEL RESCUE, INC.*

*v.*

*GINGER RICHARDS AND KIMBERLY ARCHER,
CO-EXECUTRIX AND CO-TRUSTEES OF THE
BARRY C. BLACKBURN, REVOCABLE LIVING
TRUST, JUNE HOLLEY OLIN, EXECUTRIX OF
BARRY C. BLACKBURN, JR., REBECCA LOWRY,
GUARDIAN AD LITEM DEBRA PACE BRANAN,
FOR MINORS DAVID WILLIAMS LOWRY,
ELEANOR REBECCA LOWRY AND PHOEBE
ELIZABETH LOWRY*

DATE OF JUDGMENT:        08/02/2018
TRIAL JUDGE:              HON. MITCHELL M. LUNDY, JR.

TRIAL COURT ATTORNEYS: JOHN THOMAS LAMAR, JR.
 D. PACE BRANAN
 LOUIS H. WATSON, JR.
 WILLIAM BRADLEY PALMERTREE
 SARAH KATHERINE EMBRY
 GORDON CHARLES SHAW, JR.
 J. CAL MAYO, JR.
 MICHAEL KEVIN GRAVES
 HARRIS H. BARNES, III
 SIMPSON GRAY EDMONDSON
 L. LEE TYNER, JR.
 ROBERT TUBB JOLLY
 JOHN THOMAS LAMAR, III

COURT FROM WHICH APPEALED: DESOTO COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: JOHN THOMAS LAMAR, III
 TAYLOR ALLISON HECK

ATTORNEYS FOR APPELLEES: HARRIS H. BARNES, III
 MICHAEL KEVIN GRAVES
 GORDON CHARLES SHAW, JR.
 JAMES WILLIAMS JANOUSH
 J. CAL MAYO, JR.
 SARAH KATHERINE EMBRY
 D. PACE BRANAN

NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION: ON DIRECT APPEAL: AFFIRMED. ON
 CROSS-APPEAL: REVERSED AND
 REMANDED  -  08/13/2020

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from the DeSoto County Chancery Court's reformation of a trust

based on the court's finding that a scrivener's error had occurred in drafting the trust

instrument, which rendered the trust's language ambiguous and thwarted the grantor's intent.

The estate of Barry Christopher Blackburn, Jr., along with four nonprofit groups named in

the trust appeal from the chancery court's decision, claiming that the trust's language is not ambiguous and that the chancery court erroneously disregarded the grantor's intent as stated in the trust.

¶2. We affirm the chancery court's reformation of the trust. We reverse and remand for further proceedings, however, the chancery court's award of attorneys' fees in this case.

## FACTS AND PROCEEDINGS

¶3. Barry Christopher Blackburn, Sr. (Barry), an estate-planning attorney, died on March 21, 2014, from cancer. Ten days before he died, Barry executed "The Barry C. Blackburn, Sr. Revocable Living Trust" to provide income and principal to himself during his lifetime and then income to his only son, Barry Christopher Blackburn, Jr. (Christopher), during Christopher's lifetime.

¶4. Kimberly Archer and Ginger Richards were made co-trustees (Trustees) of Barry's trust. Both Archer and Richards worked for Barry. Richards initially worked as Barry's paralegal, but became Barry's personal assistant. Archer worked for a Barry as a paralegal since 1999, and she drafted the trust.

¶5. The trust provision (referred to as Section 2.3(D)(3)) at issue in this case was drafted as follows:

> Upon the death of [Christopher], the undistributed balance shall be divided equally among his then living issue, per stirpes, subject to the same trust provisions herein. It is the Grantor's specific intent and request that his family farms, trust principal and properties vest with the Grantor's grandchildren upon the youngest grandchild attaining forty-five (45) years of age. If [Christopher] shall predecease the Grantor prior to the complete distribution of the trust principal and has no living issue, then the remaining trust principal shall be retained for the benefit of Rebecca Lowry's children (Grantor's nieces

3

and nephews) subject to the same trust provisions herein specified for the Grantor's grandchildren. Upon the death of a child of Rebecca Lowry prior to the complete distribution of the trust principal, then the remaining trust principal shall be distributed to the remaining surviving niece or nephew, per capita. If the Grantor has no surviving beneficiaries as specified herein, then any remaining trust principal shall be distributed as follows: one-fourth (1/4) to Nashville Christian School; one-fourth (1/4) to Harpeth Presbyterian Church in Nashville, Tennessee; one-fourth (1/4) to the Ole Miss Law School (to fund an estate planning program); and one-fourth (1/4) to the Boykin Spaniel Rescue.

¶6.    The language at issue in this case is contained in the provision's third sentence, as follows:

> If [Christopher] shall predecease the Grantor prior to the complete distribution of the trust principal and has no living issue, then the remaining trust principal shall be retained for the benefit of Rebecca Lowry's children (Grantor's nieces and nephews) subject to the same trust provisions herein specified for the Grantor's grandchildren.

¶7.    Tragically, Christopher died in July 2015 at the age of twenty-one with no children. Following Christopher's death, the Trustees notified Barry's sister, Rebecca Lowry, that her three minor children (Barry's nieces and nephew) were now the beneficiaries of the trust.

¶8.    In August 2015, an attorney representing June Holley Olin (the Administratix of Christopher's estate),[1] contacted the Trustees. The attorney informed the Trustees that based on the language in Section 2.3(D)(3) of the trust, Christopher was the sole heir at law of Barry. Because Christopher did not predecease Barry as specified in Section 2.3(D)(3), the attorney argued, the trust's assets belonged to Christopher's estate.

---

[1] Olin is the sister of Christopher's mother, Chanda Will. Chanda and Barry divorced in 1995. Olin, erroneously, is referred to as the "Executrix" of Christopher's estate in the styling of this case. Christopher, however, died intestate, which would make Olin the administratrix of his estate.

¶9.  Afterwards, the Trustees commenced the instant action in chancery court to have the court construe the trust to determine the proper beneficiaries of the trust. The Trustees claimed that a scrivener's error had occurred that rendered the trust ambiguous, and they sought to have the court construe the trust consistent with Barry's intent that the current beneficiaries should be Barry's nieces and nephew.

¶10.  Lowry and the minors filed a counterclaim and a cross-claim requesting that the chancery court construe Section 2.3(D)(3) consistent with Barry's stated intent to the Trustees that the minors were the proper beneficiaries. Lowry, individually, also requested that in the event that the chancery court were to determine that the minors were not the proper beneficiaries, then she is the proper beneficiary under Section III, Paragraph 3.3, of the trust.

¶11.  The nonprofits claimed that Section 2.3(D)(3) is unambiguous and that the plain language of the section establishes the non-profits as the proper beneficiaries.

¶12.  Olin likewise claimed that Section 2.3(D)(3) is unambiguous, but claimed that Christopher's estate is the proper beneficiary. Olin also claimed that $200,000 of college expenses had vested in Christopher's estate.

¶13.  A trial took place on October 4, 5, and 6 of 2017, and on February 8 and 9 of 2018. The Trustees and the minors called the following witnesses: Richards, Archer, Bill Richards, John St. Claire, Rob Brown, Bill Barkley, Lowry, and Thomas Davis. Olin called the following witnesses: Chanda, Olin, and James Sidney Olin. The nonprofits did not call any witnesses.

¶14. According to the testimony, both Richards and Archer worked for Barry for many years. Richards initially worked for Barry as a paralegal, and she later began doing more of Barry's administrative work, e.g., accounting, bookkeeping, working with Barry's accountant, his bankers, collecting rent, and paying the bills, until Barry's death in 2014. Richards and Barry had a "brother-sister" relationship, and she discussed Barry's personal life with him as it related to Christopher and Barrys' ex-wife, Chanda. Richards wrote checks for Barry and while handling his finances never had written a check for the nonprofits.

¶15. Richards testified that in estate planning, Barry would instruct her and Archer on what the client wanted and they would then "cut and paste from other documents." She said Barry was very big on legacy, and he believed everybody should leave things to family generations. Legacy was family to Barry, and Barry was big on the "Blackburn Legacy." Richards, who drafted Barry's trust, was emphatic that the "predecease" language omitting the phrase "or dies" behind it, should not have been written that way. She stated that the "mistake" was likely a continuation from a previous document, "probably in the form she and [Archer] used."

¶16. Richards said that in December 2013, a few months before Barry's death, Barry went to "MD Anderson" and received the results he thought he was going to get regarding his cancer. "That's when he began really discussing what he really wanted to do with his estate."

¶17. Barry talked to Archer specifically about the documents, and he talked to Richards about how to administer the trust and how to administer his estate. Barry wanted Richards

6

to know how to fund the estate. Richards took handwritten notes reflecting Barry's plans and intentions, which were submitted into evidence.

¶18. Archer testified that she was the primary person to draft estate-planning documents for Barry. She "pulled forms from other existing wills and trusts" and utilized a "cut and paste" system from a "forms" folder comprised of existing estate-planning documents. Archer said that Barry did not "personally prepare a will or a trust" for anyone, and he did not pay close attention to the language and did not "read documents word for word."

¶19. Archer testified that based on her conversations with Barry, his intent was for his estate to go to his nieces and nephew if Christopher died without any children. Archer also took handwritten notes while conversing Barry about his estate and later rewrote the notes. Archer was also emphatic about Barry's desire to keep his inherited properties within the Blackburn family. She said Barry loved his nieces and nephew, and he kept pictures of them in both his office and in his condominium "at Orange Beach."

¶20. Archer testified that she drafted the 2014 Trust Agreement using both sets of her handwritten notes, specifically her notes reflecting, "if Christopher is gone, and he has no children then it goes to his nieces and nephews." Archer said she drafted the trust consistent with Barry's stated intentions, with the exception of the language she mistakenly used in Section 2.3(D)(3), which she later realized caused the section to "make no sense." Archer testified that she intended to draft Section 2.3(D)(3) consistent with Barry's intent that "if Christopher is gone, and he has no children then it goes to his nieces and nephews. If for

7

some reason they're not living, then it would go to charities" as "default takers." Archer said that it was simply "illogical that [Christopher] would have predeceased his father."

¶21. St. Claire, a financial consultant, testified that he knew Barry for twenty years. They worked on numerous estates together. He said Barry trusted Richards and Archer "explicitly." St. Claire said Barry would do very little with regard to drafting documents. "He would just hit the high points." He said Barry used trusts "to keep money in the blood line." He said Barry would only use charities as a "catastrophic or catchall clause." St. Claire said that Barry would speak of his nieces and nephew and indicated "there was love there."

¶22. Brown worked for Barry as a financial adviser for twenty years. Brown said Richards and Archer did everything while working for Barry. Brown said Barry wanted "everything to stay within his family. He was very proud of the Blackburn family." Brown said Barry's use of charities in estate planning was a "last resort." If the person had no family, then it would go to charities.

¶23. Barry's sister and only sibling, Lowry, testified that she has three children. Barry had their photos displayed at his office and home, and he had them with him at Richards's home while he stayed there on hospice before his death. Lowry recounted Barry's relationship with their grandfather, Stephen Blackburn, and about what Barry referred to as "blood money" from the tragic deaths of his and Lowry's parents in separate auto accidents.

¶24. Davis, one of Barry's best friends from law school, who often worked with Barry, testified that Archer drafted all of the documents for Barry. He said that Barry reviewed his

8

documents "quickly" and "sloppily."  Davis said it would not surprise him "if there was a drafting mistake in one of [Barry's] own estate planning documents."  He said Barry would just do a quick review when he was reading and "just flip through them."

¶25.    The chancery court found Section 2.3(D)(3) of the trust to be patently and latently ambiguous, and it did not correctly state Barry's clear intention, which was for the minors to benefit from the trust in the event that Barry had no lineal descendants at any time after his death.  The court found that Barry's clear intent is revealed by a thorough reading of the entire trust instrument as well as the uncontroverted extrinsic evidence presented at trial.  The court found that the evidence showed that the ambiguity resulted from a scrivener's error on the part of Archer.  Accordingly, the chancery court reformed Section 2.3(D)(3) to read, in pertinent part,  as follows:

> If [Christopher] shall predecease the Grantor **or die** prior to the complete distribution of the trust principal and has no living issue, then the remaining trust principal shall be retained for the benefit of Rebecca Lowry's children (Grantor's nieces and nephews) subject to the same trust provisions herein specified for the Grantor's grandchildren.

¶26.    Even though Olin and the nonprofits were unsuccessful in their respective cases, the chancery court awarded the parties attorneys' fees from the trust.  The chancery court approved Olin's attorneys' fees in the amounts of $174,245.51 to Lamar & Hannaford, P.A., and $72,064.70 to Edwards & Prince, P.C.  The chancery court also approved the nonprofits' attorneys' fees  in the amount of $184,512.93 to Mayo Mallette, PLLC.

¶27. Olin and the nonprofits appeal from the chancery court's judgment, reforming Section 2.3(D)(3) of the trust. The Trustees and the minors cross-appeal from the chancery court's award of the attorneys' fees stated above.

**DISCUSSION**

## I. Reformation of the Trust

¶28. As the chancery court stated, one of "the most solemn obligation[s] any court can have [is] to see that the true intent of the testator is carried out." *In re Estate of Vick*, 557 So. 2d 760, 765 (Miss. 1989) (citing *Costello v. Hall*, 506 So. 2d 293 (Miss. 1987)). "[T]here is no Constitutional right more jealously safeguarded than the absolute freedom of a testator to dispose of his own property as he chooses." *Id.* A testator's intent "is to be ascertained from the testamentary documents themselves, if possible, with the aid of established rules of construction." *In re Loeb's Will*, 206 So. 2d 615, 617 (Miss. 1968). And this Court also has instructed as follows:

> It is a well-settled canon for the construction of wills that the court will take into consideration the attending circumstances of the testator, the quantity and character of his estate, the state of his family, and all facts known to him which may reasonably be supposed to have influenced him in the disposition of his property.

*Id.* (quoting *Schlottman v. Hoffman*, 73 Miss. 188, 199, 18 So. 893, 895 (1895)); *see also Gordon v. McDougall*, 84 Miss. 715, 37 So. 298, 300 (1904) ("For the only way fairly to ascertain the true intent of a testator is not to look to any single sentence or special provision, but to gather that intent from the whole will, so that the paramount purpose dominating the instrument shall be given effect."). The *Gordon* Court added,

> The true intent and meaning of the testator can be best ascertained by the courts and those concerned in the execution of the will by putting themselves, so far as may be, in the place of the testator, and reading all his directions therein contained in the light of his environment at the time it was made. When that intent and meaning can be thus clearly ascertained, then all technical rules and adjudicated cases in other jurisdictions that would stand in the way of its execution must be disregarded.

*Id.* at 300 (quoting ***Murphy v. Carlin***, 20 S.W. 786, 786-87 (Mo. 1892)).

¶29.    The chancery court found that the terms in Section 2.3(D)(3), "If [Christopher] shall predecease the Grantor" and "prior to complete distribution of the trust principal," to be directly contradictory and incompatible because they refer to totally different points in time. The former refers to Christopher's death before any distribution of the trust principal ("predecease the Grantor"). And the latter refers to Christopher's death before distribution of all of the trust principal ("prior to the complete distribution of the trust principal").

¶30.    The chancery court found the phrases redundant and nonsensical. The court said they are redundant  because if Christopher had died before Barry, then none of the trust principal would have been distributed at that point.  And "any predeceasing by Christopher would necessarily have been prior to the complete distribution of the trust principal since no trust principal was to be distributed under Section 2.3(D) until after Barry's death pursuant to Section II (Distribution and Administration of Trust Following Death of Grantor)."

¶31.    The chancery court found that it "defies logic and common sense" that the gift would be conditioned on Christopher's dying before any distribution of the trust principal and before complete distribution of the trust principal when no trust principal could be distributed

until after Barry's death. According to the chancery court, the two phrases clearly were not intended to be joined in such a nonsensical manner.

¶32. The chancery court found that this ambiguity is further demonstrated by the references to the "remaining" language used in Section 2.3(D)(3). "If Christopher predeceasing Barry is a condition precedent to the creation of the trusts for Barry's nieces and nephew," then the phrase "the remaining trust principal shall be retained for the benefit of Rebacca Lowry's children" is nonsensical. The court found that the term "remaining" necessarily implies that some of the trust principal had been distributed and that some of the principal remained after the death of the prior beneficiary.

¶33. We agree with the chancery court. The language contained Section 2.3(D)(3) is clearly ambiguous when construed with the reading of the trust as a whole. Section 2.3 is titled "Distribution of Trust." The first sentence of the section reads: "Upon the death of the Grantor, the Trustee shall distribute the assets subject to the terms of this instrument . . . ." This language renders the "predecease" provision contained in Section 2.3(D)(3) nonsensical—particularly in light of the language that immediately follows it: "the Grantor prior to the complete distribution of the trust principal . . . ."

¶34. As the chancery court found, when the trust is read as a whole, Barry's actual intent with Section 2.3(D)(3) becomes clear. The chancery court found that Section 2.3(D)(3) set out a hierarchy, or layering, of contingent interests. Specifically, Barry intended to provide Christopher with a lifetime discretionary interest in the trust. At Christopher's death, the trust was to be divided equally among Christopher's issue; they were to receive the family

12

farms and trust principal upon the youngest grandchild attaining forty-five (45) years of age. Thus, contrary to Olin's claim otherwise, no property would vest with any beneficiary until Barry's youngest grandchild, or if no grandchildren, his youngest niece or nephew's attaining the age of forty-five years.

¶35.    Moreover, under Section 2.3(D)(3), only if Barry had no living lineal or collateral descendants ("surviving beneficiaries") would the nonprofits take as alternative contingent beneficiaries.    Barry, however, had surviving beneficiaries as specified in Section 2.3(D)(3)—his nieces and nephew.

¶36.    This, coupled with the uncontroverted evidence submitted at trial by the Trustees and the minors, demonstrates that the chancery court's decision is supported by clear and convincing evidence.  A mistake was made in drafting Section 2.3(D)(3), and Barry's true intention was that upon Christopher's death without living issue, the trust would continue for the benefit of Barry's nieces and nephew under the same terms as would have been applied for Barry's grandchildren.

## II.    College Expenses

¶37.    Olin claims that Christopher had a fully-vested interest in his college expenses on the day Barry died.  Olin submitted that Belmont University was Christopher's first choice for attending college.  Jim Olin testified that from his personal knowledge of having a daughter attending college there, the cost of attending Belmont University is $50,000 per year. Accordingly, Olin claimed that Christopher's estate has a fully vested interest in his college expenses in the amount of $200,000.  For support, Olin cites *Hickman v. Hickman*, 190 So.

13

2d 853, 854 (Miss. 1966), in which this Court affirmed the chancery court's judgment that "trust funds became vested in the two beneficiaries at the time of testator's death, and that no condition could be implied that the beneficiaries must survive until the date of distribution in order to take vested interests."

¶38.   While the chancery court did not explicitly address this claim in its final order, the order implicitly denied it nonetheless.  Barry's trust provided the following with respect to the trust's benefitting Christopher:

> D.     **Trust for [Christopher]**
>
> The trust principal shall be held, administered and retained for the benefit of the Grantor's son, [Christopher].  The trustee shall distribute the trust as follows:
>
> (1)     The Trustee shall pay for the college expenses of the beneficiary and may, at its discretion, distribute to the beneficiary upon him reaching the age of thirty (30), all or any part of the net income as the Trustee shall deem necessary or desirable.  Any income not distributed shall be retained in trust and added to principal.
>
> (2)     If in the discretion of the Trustee circumstances have arisen which make it desirable, the Trustee may distribute to the beneficiary such amounts of principal as the Trustee shall deem necessary for the college education and health of the beneficiary.  In the exercise of this discretion, the Trustee shall consider the needs of the beneficiary and the funds available to him from other sources.
>
> (3)     Upon the death of [Christopher], the undistributed balance shall be divided equally among his then living issue, per stirpes, subject to the same trust provisions herein. It is the Grantor's specific intent and request that his family farms, trust principal and properties vest with the Grantor's grandchildren upon the youngest grandchild attaining forty-five (45) years of age.

¶39. We agree with the Trustees that Christopher was only entitled to college expenses while living. No trust principal would vest with Christopher or his estate. As the chancery court found, "Barry intended to provide Christopher with a lifetime discretionary interest in the Trust" and "no trust property would vest with any beneficiary until Barry's youngest grandchild, or if no grandchildren, his youngest niece or nephew, attained the age of forty-five (45) years."

¶40. *Hickman* is distinguishable. *Hickman* involved a testamentary trust of a stated sum of money for two minors that was to be put in a fund and could not be withdrawn until the minors started college. *Hickman*, 190 So. 2d at 853. There, the testator's will provided, "I would like for . . . my nephew and niece to have $10,000.00 each put in a fund so they will not start drawing their money until they start college." *Id.* at 854. This Court agreed with the chancery court in that case that "this created an estate in the funds, vested in interest in the two minors, but not vested in possession . . . ." *Id.* at 853-54. This Court held that,

> The terms of the bequests negative the existence of any condition precedent or subsequent. The testator left to his nephew and niece $10,000 each. Those two sums were to be put in a fund, impliedly administered by a trustee. The beneficiaries would 'not start drawing their money' until they began college. The money is identified as 'their money.' There are no restricting or limiting words upon the gifts themselves. Accordingly we conclude that the gifts were vested in interest, not contingent.

*Id.* at 854.

¶41. Here, at the time of Barry's death, Christopher was attending community college in Florida. Chanda testified that she had college in "Florida prepaid" for the spring semester of 2014 while Barry was alive. Pursuant to an agreed order entered in Barry and Chanda's

15

divorce, Chanda agreed to a prepaid tuition plan, which Barry would reimburse upon Christopher's attending college.[2] But pursuant to an order of emancipation, all of Barry's support obligations with respect to Christopher were terminated, including college.

¶42. No evidence was presented that Christopher ever attended college after the spring of 2014. And no evidence was presented that Christopher ever applied to or attended Belmont University. Accordingly, we find no merit to this claim.

### III. Attorneys' Fees

¶43. The chancery court awarded attorneys' fees to Olin and the nonprofits as follows: for Olin—$174,245.51 to Lamar & Hannaford, P.A., and $72,064.70 to Edwards & Prince, P.C.; for the nonprofits—$184,512.93 to Mayo Mallette, PLLC. The chancery court did so in a two sentence order based on the supplemental motions filed by the Olin and the nonprofits.

¶44. The motions relied on authority provided by Mississippi Code Section 91-8-1004(a), which states as follows: "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." Miss. Code § Ann. 91-8-1004(a) (Rev. 2018).

¶45. Neither this Court nor the Court of Appeals has addressed Section 91-8-1004(a), which became effective in July 2014, when the Mississippi legislature enacted the Mississippi Uniform Trust Code.

---

[2] Olin does not argue for reimbursement of the prepaid tuition plan.

16

¶46.    The Trustees point to an Oklahoma case, *Atwood v. Atwood*, 25 P.3d 936, 946-47 (Okla. Civ. App. 2001), which they contend that other courts have looked to for analysis of their own respective Uniform Trust Code (UTC) statutory provisions similar to Section 91-8-1004(a).  In *Atwood*, the appellate court addressed an Oklahoma statute that governs judicial proceedings involving trusts.  *Atwood*, 25 P.3d at 947 ("60 O.S. Supp. 2000, 175.57(D), is a specific statute authorizing recovery of litigation-related expenditures, at the discretion of the trial court, in a 'judicial proceeding involving a trust.'").  This Oklahoma statute is identical to Mississippi Code Section 91-8-1004(a).

¶47.    Like Mississippi, Oklahoma follows the American rule with the right of a litigant to recover attorneys' fees.  "[A]bsent some statutory authority or contractual provision, attorneys' fees cannot be awarded unless punitive damages are proper."  *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 287-88 (Miss. 2012) (internal quotation marks omitted) (quoting *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 486 (Miss. 2002)); *see also Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 178-79 (Okla. 2000) (The American rule "is firmly established in Oklahoma . . . and provides that courts are without authority to award attorney fees in the absence of a specific statute or a contractual provision allowing the recovery of such fees, with certain exceptions." (citing *TRW/Reda Pump v. Brewington*, 829 P.2d 15, 22 (Okla. 1992))).

¶48.    *Atwood* held that "[60 O.S. Supp. 2000] 175.57(D) provides a statutory exception to the American Rule. The exception arises when 'justice and equity may require' that fees, costs, and expenses be awarded." *Atwood*, 25 P.3d at 947.  *Atwood* then provided,

17

The highly subjective phrase "justice and equity" does not state specific guidelines or criteria for use by a trial court or for use by a reviewing court. The phrase connotes fairness and invites flexibility in order to arrive at what is fair on a case by case basis. Hence, general criteria drawn from other types of cases provide nonexclusive guides. These include (a) reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the bringing or conduct of the litigation.

*Id.*

¶49. Before the enactment of Section 91-8-1004(a), there was no Mississippi statute that authorized an award of attorneys' fees to nonfiduciary beneficiaries of a trust. *See, e.g.*, *In re Estate of McLemore v. McLemore*, 63 So. 3d 468, 486 (Miss. 2011) (recognizing that "no statutory or testamentary authority exists to support [the beneficiaries'] fee requests"). *McLemore* noted, however, that "[o]ther states have allowed attorney-fee awards to nonfiduciary beneficiaries where their efforts benefitted the estate and became necessary because of 'laches, negligence, or fraud of the legal representative of the estate.'" *Id.* at 487 (quoting *Becht v. Miller*, 273 N.W. 294, 298 (Mich. 1937)).

¶50. *McLemore* noted that the *Becht* Court stated, as follows:

[T]he case at bar presents the question of the allowance from an estate as administrative expenses of fees and expenses incurred not by the executor or administrator but by a residuary legatee. The question in its precise form has never been heretofore presented for consideration in this jurisdiction. Examination of the decisions of other states reveals the existence of conflicting opinion, but as a general proposition it may be stated that, before such an item may be charged against the estate, it must be shown that the services rendered were beneficial to the estate as a whole rather than to an individual or group of individuals interested therein.

. . . .

A doctrine which permits a decedent's estate to be so charged, should, however, in our opinion, be applied with caution and its operation limited to those cases in which the services performed have not only been distinctly beneficial to the estate, but became necessary either by reason of laches, negligence, or fraud of the legal representative of the estate.

*McLemore*, 63 So. 3d at 487 (quoting *Becht*, 273 N.W. at 297-98).

¶51. *McLemore* further added,

Other states have applied the principles enunciated in *Becht*, but found that fees were not authorized, as the services had not benefitted the estate. *See In re Phelps' Estate*, 132 Cal. App. 2d 850, 283 P.2d 293, 295 (1955); *Distributors Supply Co. v. Shablow's Estate*, 253 Minn. 1, 92 N.W.2d 83, 88-89 (1958). Missouri likewise has embraced this concept. "Missouri seems to follow the rule that expenses incurred by a beneficiary of an estate, rather than the personal representative, must be shown to be beneficial to the estate as a whole rather than to just individuals interested therein." *In re Estate of Murray*, 682 S.W.2d 857, 858 (Mo. Ct. App. 1984). *But see Foster's Estate v. Theis*, 290 S.W.2d 185, 188–89 (Mo. Ct. App. 1956) (citing *Becht* but rejecting its reasoning).

*Id.* at 488.

¶52. Ultimately, *McLemore* adopted the principles set forth *Becht* and instructed our chancellors to consider the cautionary language and limitations set forth in *Becht*. *Id.* at 488.

¶53. In *Bank of Mississippi v. Southern Memorial Park, Inc.*, 677 So. 2d 186 (Miss. 1996), this Court dealt with attorneys' fees generated by counsel acting on behalf of a trustee. Construing certain former trust act provisions, *Bank of Mississippi* held that "various statutes imply that, when related to the administration of the trust, attorneys' fees are reasonable expenses entitling the trustee to reimbursement." *Id.* at 189 (speaking to former Miss. Code Ann. §§ 75-63-7 (1991), 41-43-37(1), (5) (1993), and 91-9-107(1), (3) (Rev. 1994)).

19

¶54.   ***Bank of Mississippi*** cautioned, however, that "[a] trustee should not allow its counsel

to undertake extraordinary legal measures to ensure that the letter of the law is followed with

regard to matters of dubious importance, particularly if doing so would unduly deplete the

assets of the trust." ***Id.*** at 191-92.  ***Bank of Mississippi*** explained,

> Chancellors should carefully scrutinize any requests for attorneys' fees to be paid out of trust income to determine whether said amounts are fair in relation to the amount of work done. The chancellor should also consider the importance of the interest of the beneficiaries which the trustee is seeking to protect, as well as whether the trust would be able to continue to perform its stated functions if the expenses were allowed to be paid out of trust income. In cases involving misuse of trust assets to generate legal fees or to promote some interest of the trustee, it is, of course, within the discretion of the chancellor to deny attorneys' fees in their entirety.

***Id.*** at 191.

¶55.   Here, we agree with the ***Atwood*** Court that the phrase "justice and equity . . . connotes

fairness and invites flexibility in order to arrive at what is fair on a case by case basis."

***Atwood***, 25 P.3d at 947.  And we think that ***Atwood*** has provided proper guidelines to help

facilitate that aim, as those guidelines also serve to safeguard against what this Court

cautioned in ***McLemore*** and ***Bank of America***.  Therefore, we adopt those guidelines for

purposes of Section 91-8-1004(a).

¶56.   While a mistake had been made with the drafting of the trust instrument which

justified correction of the trust's language by the chancery court, this was not a complicated

case.  As the chancery court found, a reading of the whole trust instrument itself reveals that

a mistake had been made and it clearly shows Barry's true intent regarding the corpus of the

trust.  Nevertheless, this case was heavily litigated amongst the parties, and the chancery

court made no findings that the attorneys' fees were "reasonable" or that "justice and equity" required the attorneys' fees be paid from the trust.

¶57.    Accordingly, we reverse the chancery court's award of attorneys' fees, and we remand the case for further proceedings in the chancery court for the above-referenced guidelines to be applied.[3]

**CONCLUSION**

¶58.    On direct appeal, the chancery court's reformation of the trust is affirmed.  On cross-appeal, the chancery court's award of attorneys' fees is reversed and remanded for further proceedings consistent with this opinion.

¶59.    **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, ISHEE AND GRIFFIS, JJ., CONCUR.  CHAMBERLIN, J., NOT PARTICIPATING.**

---

[3] Olin filed a motion to correct and/or supplement the record to add post-trial briefs to the record.  The trial court denied Olin's request to supplement the record to include post-trial briefs.  Olin's motion to supplement the record on appeal to include her post-trial briefs is not well taken and is hereby denied.

Olin also filed a motion for post-trial attorneys' fees for preparation for this appeal. Olin's motion is not well taken and is hereby denied.